PENA, Admr., et al., Appellants,

v.

NORTHEAST OHIO EMERGENCY AFFILIATES, INC. et al., Appellees.

[Cite as *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 94CA005906.

Decided Dec. 20, 1995.

98

_Mark Stephenson,_ for appellants.

_William Bonezzi, Susan Reinker, Joan Ford, Johanna Sfiscko_ and _J.C. William Tattersall,_ for appellees.

---

DICKINSON, Judge.

Plaintiff Gilbert Pena, as the administrator of the estates of Cynthia M. Pena and Baby Doe Pena, has appealed from a judgment of the Lorain County Court of Common Pleas. He has argued that the trial court (1) incorrectly denied him a new trial on the issue of damages for the wrongful deaths of his wife Cynthia Pena and his unborn child because (a) the jury's award of damages was "grossly inadequate and against the manifest weight of the evidence" and (b) the court had determined that the jury's award was not sustained by the weight of the evidence; (2) incorrectly overruled his motion _in limine_ and objections at trial aimed at precluding the defendants from asking him about his remarriage because R.C. 2125.02(A)(3)(b)(iii), which permits a defendant in a wrongful death action to present evidence that the surviving spouse has remarried, infringes on the fundamental right to marry in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and impermissibly limits damages in violation of Section 19a, Article I of the Ohio Constitution; (3) incorrectly overruled his objections to questions regarding how long he had known his second wife, what services she performed for the family, and whether she was employed outside the home because R.C. 2125.02(A)(3)(b)(iii) permits a defendant to present only evidence of the fact of remarriage; (4) incorrectly instructed the jury that it must return verdicts of "at least one dollar" and funeral expenses for the wrongful deaths of Cynthia Pena and Baby Doe Pena; (5) incorrectly granted defendant Josef F. Korinek's motion for a directed verdict; and (6) incorrectly refused to instruct the jury on the successive tortfeasor rule.[1] This court partially affirms the judgment of the trial court because (1) R.C. 2125.02(A)(3)(b)(iii) does not violate due process or equal protection rights and does not limit recoverable damages on a wrongful death action in violation of Section 19a, Article I of the Ohio Constitution; (2) R.C.

---

1. Plaintiff's assignments of error have been rearranged for ease of discussion.

2125.02(A)(3)(b)(iii) does not limit a defendant to simply proving the fact of remarriage, and the trial court did not abuse its discretion in finding that questions regarding how long Mr. Pena had known his second wife, what services she performed in the home, and whether she worked outside the home were relevant to determining what damages he suffered by reason of Cynthia Pena's death; (3) plaintiff waived any right to claim as error the court's instruction to return a verdict of "at least one dollar" because his objection did not comply with Civ.R. 51(A); and (4) assuming the trial court erred in refusing to instruct the jury on the successive tortfeasor rule, that error was harmless. This court, however, partially reverses the judgment of the trial court because the trial court erred (1) in overruling plaintiff's motion for a new trial on the issue of damages for the wrongful deaths of Cynthia Pena and Baby Doe Pena; and (2) in directing a verdict in favor of defendant Josef F. Korinek, M.D.

## I

Cynthia M. Pena was twenty-seven years old and pregnant with her third child when she contracted chickenpox. She developed varicella pneumonia as a complication. On the morning of March 16, 1989, she went into premature labor and delivered a twenty-four-week stillborn male. At 4:10 p.m. on that same day, she died from multiorgan failure and hypoxia caused by the varicella pneumonia.

On March 23, 1992, plaintiff, in his capacity as the administrator of the estates of Cynthia Pena and Baby Doe Pena, filed a complaint against defendants Northeast Ohio Emergency Affiliates, Inc.,[2] Stephen B. Evans, M.D., Brian Kirkland, D.O., St. Joseph Hospital & Health Center, Harold D. Belizaire, M.D., Inc., Harold D. Belizaire, M.D., Alexander H. Boye–Doe, M.D., Inc., Alexander H. Boye–Doe, M.D., and Josef F. Korinek, M.D. He alleged that defendants were negligent in their treatment of his wife Cynthia Pena, thereby proximately causing her death and the death of their unborn child. He sought compensation for the wrongful deaths of Cynthia Pena and their unborn child and for the pain and suffering that Mrs. Pena experienced prior to her death.

Plaintiff's claims were tried to a jury. At the close of plaintiff's case, Korinek moved for a directed verdict on the ground that plaintiff had failed to establish that he owed a duty to Mrs. Pena. The trial court directed a verdict in favor of Korinek, finding that reasonable minds could not conclude that he owed a duty to Mrs. Pena. On March 24, 1994, the jury entered verdicts in favor of defendants Stephen B. Evans, M.D., Harold D. Belizaire, M.D., Inc., Harold D. Belizaire, M.D., Alexander H. Boye–Doe, M.D., Inc., and Alexander H. Boye–Doe, M.D.,

---

2. Northeast Ohio Emergency Affiliates, Inc. is the medical practice of defendants Stephen B. Evans, M.D. and Brian Kirkland, D.O.

and in favor of plaintiff against defendants Northeast Ohio Emergency Affiliates, Inc, Brian Kirkland, D.O., and St. Joseph Hospital & Health Center. The jury indicated in answers to interrogatories that they had found that defendants Brian Kirkland, D.O., and St. Joseph Hospital & Health Center were negligent in their treatment of Mrs. Pena and that their negligence was a proximate cause of the deaths of Mrs. Pena and her unborn child. The jury further found that defendants Stephen B. Evans, M.D., Harold D. Belizaire, M.D., and Alexander H. Boye–Doe, M.D. were not negligent.

The jury originally awarded plaintiff $110,000 in damages for the pain and suffering of Mrs. Pena and no damages for the wrongful deaths of Mrs. Pena and the unborn child. The court, however, instructed the jury that they must return a verdict of "at least one dollar" plus the stipulated funeral expenses on the wrongful death claims. After further deliberation, the jury awarded plaintiff damages of $1 plus $5,970.42 in funeral expenses for the wrongful death of Cynthia Pena and $1 plus $90 in funeral expenses for the wrongful death of Baby Doe Pena. Plaintiff moved the court pursuant to Civ.R. 59 for a new trial on the issue of damages on the wrongful death claims. The court denied that motion. Plaintiff timely appealed to this court.

## II

### A

Plaintiff's first assignment of error is that the trial court incorrectly overruled his motion for a new trial on the issue of damages because the jury's award of $1 plus funeral expenses for the two wrongful death claims was "grossly inadequate and against the manifest weight of the evidence." He has further asserted that the trial court acknowledged that the jury's award of damages was not supported by the weight of the evidence and thus should have granted him a new trial on the issue of damages. Plaintiff has claimed a right to a new trial pursuant to Civ.R. 59(A)(4) and (6). Civ.R. 59(A)(6) provides that a trial court may grant a new trial on the ground that the judgment "is not sustained by the weight of the evidence." Civ.R. 59(A)(4) provides that a trial court may grant a new trial on the ground of excessive or inadequate damages that appear "to have been given under the influence of passion or prejudice." The granting of a motion for a new trial on either ground rests in the sound discretion of the trial court and will not be disturbed on appeal unless there has been an abuse of discretion. *Monroe v. Ohio Dept. of Rehab. & Corr.* (1990), 66 Ohio App.3d 236, 240, 583 N.E.2d 1102, 1104; *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 184, 7 OBR 229, 231–232, 454 N.E.2d 976, 979. An abuse of discretion will be found when the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ A new trial should be granted pursuant to Civ.R. 59(A)(6) when the jury's award of inadequate damages resulted from its failure to consider an element of damages that was established by uncontroverted evidence. *Dillon v. Bundy* (1992), 72 Ohio App.3d 767, 773, 596 N.E.2d 500, 504. A new trial should also be awarded if the jury's verdict was not supported by competent, substantial, and credible evidence. *Id.* at 773–774, 596 N.E.2d at 504–505; *Verbon,* 7 Ohio App.3d at 183, 7 OBR at 229–231, 454 N.E.2d at 978–979.

▮ An appellate court reviewing whether a trial court abused its discretion in ruling on a motion for a new trial pursuant to Civ.R. 59(A)(4) must consider (1) the amount of the verdict, and (2) whether the jury considered improper evidence, improper argument by counsel, or other inappropriate conduct which had an influence on the jury. *Dillon,* 72 Ohio App.3d at 774, 596 N.E.2d at 505. To support a finding of passion or prejudice, it must be demonstrated that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities. *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 257, 598 N.E.2d 1174, 1181; *Pearson v. Cleveland Acceptance Corp.* (1969), 17 Ohio App.2d 239, 245, 46 O.O.2d 411, 415, 246 N.E.2d 602, 606. The mere size of the verdict is insufficient to establish proof of passion or prejudice. *Jeanne,* 74 Ohio App.3d at 257, 598 N.E.2d at 1181; *Pearson,* 17 Ohio App.2d at 245, 46 O.O.2d at 415, 246 N.E.2d at 606.

R.C. 2125.01 authorizes a decedent's personal representative to bring an action for the wrongful death of the decedent if his or her death was caused by a "wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued." The personal representative of the decedent brings the wrongful death action for the "exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin." R.C. 2125.02(A)(1). In a wrongful death action, the jury may award reasonable funeral and burial expenses and such other damages as are authorized in R.C. 2125.02(B) that it finds are appropriate to compensate the decedent's beneficiaries for their loss. R.C. 2125.02(A)(2). R.C. 2125.02(B) provides that compensatory damages for a wrongful death may include damages for the following:

"(1) Loss of support from the reasonably expected earning capacity of the decedent;

"(2) Loss of services of the decedent;

"(3) Loss of society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction,

training, and education, suffered by the surviving spouse, minor children, parents, or next of kin;

"(4) Loss of prospective inheritance to the decedent's heirs at law at the time of his death;

"(5) the mental anguish incurred by the surviving spouse, minor children, parents, or next of kin."

R.C. 2125.02(A)(3)(b)(iii) permits the jury to consider evidence of the remarriage of a surviving spouse in determining the amount of damages he or she has suffered by reason of the wrongful death of a prior spouse.

Plaintiff alleged in his complaint that, by virtue of the wrongful death of his wife Cynthia Pena, her "minor children, husband, and other next of kin have lost [her] support, services, companionship, society and prospective inheritance * * *, and have suffered and will continue to suffer mental anguish * * *." He further alleged that the wrongful death of Baby Doe Pena deprived the unborn child's father, brother and sister, and next of kin of his "support, services, companionship, society and prospective inheritance" and caused them to suffer "mental anguish."

At trial, plaintiff related that he and Cynthia Pena were married on October 21, 1982, and had two children, a son born on July 16, 1982, and a daughter born on March 27, 1983. Plaintiff admitted that he and his wife had some difficulties in their marriage, but stated that, at the time of her death, their marriage had been "stronger than it had ever been." Plaintiff testified that, in addition to working full time as a bank teller, Mrs. Pena cleaned, cooked, and cared for the children. He stated that Mrs. Pena and her children were very close and that the children were devastated by the death of their mother and her unborn child:

"It still hurts them. They ask about her a lot. You know, we will go to the cemetery and, you know, they say when—every time I take [my son] to catechism, he says a prayer for mom. They just say things that are really strange. Like I had a friend come over a couple weeks ago and [my daughter] told them, you know, I had a little brother that died. It's just, you know, they're still hurt. They ask a lot of questions about her. I try to assure them that she's in a good place, that she's in heaven with the angels. That helps to some point."

He testified that Mrs. Pena's son felt responsible for the two deaths because he had contracted the chickenpox virus first and spread it to his mother and sister. He further testified that his daughter went to see a psychiatrist once because she was "missing her mom" and having difficulty in school. Plaintiff also related how Mrs. Pena's death had affected him:

"It was crushing, you know, just the way everything had transpired with how she got sick and how everything had just happened just so fast. It was a crushing blow to the kids and I both. We were both lost without words.

"I think I was off work for two or three weeks without pay just trying to get things settled in the house that she did, that she took care of, bills, everything else and lining up the baby-sitters for the kids to get them to school, it was awful hard.

" * * *

"Well, there are certain things that her and I used to do a lot that I don't do anymore. We used to go—she used to go to all my softball tournaments. She used to go to all my games. We went bowling together, you know, we went to steak frys. We did travel a lot on weekends, camping, and, you know, there is not a day that goes by that I don't think about her and how she died. It's always there a lot. I miss a lot. I miss her."

On cross-examination, Mr. Pena stated that he had remarried three months after Mrs. Pena's death and has a child with his new wife. He testified that his current wife cleans, cooks, and cares for the children and "does some [but] not all [of what Cynthia Pena did]." He further stated that his current wife was employed until she had a child during May 1993.

Plaintiff's mother explained how her son was affected by the death of his wife and unborn child:

"It was very painful for him. My son went through a lot, very painful. And I know that I just feel happy when I see him everyday, but during those times it was very painful for him. He couldn't understand why she died."

She also testified that Cynthia Pena's son blamed himself for the death of his mother and her unborn child. Mrs. Pena's sister confirmed that Mrs. Pena's son felt responsible: "[He] felt [Mrs. Pena's death] was his fault because alls he kept crying was I gave my mom chickenpox."

Mrs. Pena's mother described how her daughter's death affected her and how she missed talking to and seeing her daughter:

"I think that was the worst year that we've ever had in our lives. She just wasn't adopted; she was our daughter. She gave more joy to my children and me than anybody else."

Mrs. Pena was survived by three sisters and two brothers. One of her sisters testified that she and another sister have a mass said for Mrs. Pena every year and publish in the newspaper a writing in memory of her on the anniversary of her death and on Memorial Day. She also explained the type of relationship she had with Mrs. Pena and how the death affected her:

"She was my baby sister. We got along real well. When I was single and home I took her with me all over the place and did things for her. When I got married I remember giving her a surprise 16th birthday party and, I don't know, she was my sister. We just did things together for as long as I can remember.

" * * *

"I lost my baby sister. What more can I say? It's like I lost my dad, my stepfather, I've lost another family member."

Finally, she testified that another of Mrs. Pena's sisters was particularly devastated by her death because Mrs. Pena had been like a daughter to her.

An economist testified for plaintiff regarding how Mrs. Pena's death financially affected her family. He determined that Mrs. Pena's reasonably expected earning capacity for her lifetime, after subtracting her personal consumption, was $372,877. He based this figure on a life expectancy of 80.1 years, an assumption that she would work until she was sixty-five, and a calculation of how much she could be expected to have earned over her lifetime discounted to present value. On cross-examination, he made a number of concessions. First, he conceded that his figure was based on numerous assumptions that may not necessarily hold true. Second, he admitted that, according to United States Department of Labor statistics, Mrs. Pena would have been expected to work only to the age of 50.6, thereby reducing her expected earnings to $269,000. The economist also testified about the present value of Mrs. Pena's services as a wife and mother. He calculated this figure to be $1,579,136 based on what it would cost to hire someone to do such tasks as cleaning, cooking, and caring for children. On cross-examination, he admitted that he did not take into account plaintiff's remarriage in determining the value of Mrs. Pena's services as a wife and mother. He did state, however, that the value of her services for the three months that plaintiff had remained unmarried was $9,000.

In ascertaining the amount of damages that the beneficiaries of Mrs. Pena and Baby Doe Pena should receive, the jury was permitted to consider "all factors * * * that are relevant to a determination of the damages suffered by reason of the wrongful death." R.C. 2125.02(A)(3)(b)(i). The jury could also have considered plaintiff's remarriage in determining the amount of damages he suffered because of his wife's death. R.C. 2125.02(A)(3)(b)(iii). The jury should not, however, have considered plaintiff's remarriage in determining the amount of damages Mrs. Pena's children, parents, and next of kin suffered as a result of her death or what damages Baby Doe's beneficiaries, including plaintiff, suffered as a result of his death.

After a review of the record, this court concludes that the trial court abused its discretion in denying plaintiff's motion for a new trial on the issue of damages for

the two wrongful death claims. The jury's award of only $1 in damages plus funeral expenses to compensate the beneficiaries of Mrs. Pena and Baby Doe Pena for their wrongful deaths was not sustained by the weight of the evidence. The jury's award, moreover, was so inadequate that this court must conclude that it was the result of passion and prejudice. Plaintiff's first assignment of error is sustained.

## B

Plaintiff's second assignment of error is that the trial court incorrectly overruled his motion *in limine* and objections at trial to preclude the defendants from asking him about his remarriage. A motion *in limine* is a preliminary ruling and cannot serve as a basis for error on appeal. *Regec v. Johnson* (Mar. 31, 1995), Summit App. No. 15838, unreported, at 6, 1993 WL 89700. This court's review, therefore, is limited to whether the trial court incorrectly overruled plaintiff's objections at trial.

R.C. 2125.02(A)(3)(b)(iii) provides:

"Consistent with the Rules of Evidence, any party to an action for wrongful death may present evidence that the surviving spouse of the decedent is remarried. If such evidence is presented, then, in addition to the factors described in division (A)(3)(b)(i) and (ii) of this section, the jury or court may consider that evidence in determining the damages suffered by the surviving spouse by reason of the wrongful death."

Plaintiff has asserted that R.C. 2125.02(A)(3)(b)(iii) infringes on the fundamental right to marry in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and impermissibly limits damages in violation of Section 19a, Article I of the Ohio Constitution.

Section 19a, Article I of the Ohio Constitution provides that "[t]he amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law." In *Kennedy v. Byers* (1923), 107 Ohio St. 90, 140 N.E. 630, the Supreme Court of Ohio addressed a challenge to the constitutionality of a prior version of the wrongful death statute which permitted the beneficiaries of a decedent to recover damages only for pecuniary loss. The challenger argued that the statute was a violation of Section 19a because it prohibited the beneficiaries of a decedent from recovering damages for their nonpecuniary losses. The court held that Section 19a prohibited only the enactment of laws that place a specific limitation on the amount of recovery. *Id.* at 96, 140 N.E. at 632–633. The court, therefore, reasoned that Section 19a did not prohibit the legislature from limiting the types

of damages that are recoverable in a wrongful death action. *Id.* at 96, 140 N.E. at 632–633.

■■■ Like the statute at issue in *Kennedy v. Byers,* R.C. 2125.02(A)(3)(b)(iii) does not specifically limit the amount of damages that is recoverable in a wrongful death action. Rather, it permits the trier of fact to consider the remarriage of a surviving spouse as one of many factors that may be relevant to an assessment of the losses the surviving spouse suffered as a consequence of his spouse's wrongful death. A statute which merely permits the trier of fact to consider a factor in mitigation of the asserted losses of a beneficiary does not violate the prohibitions of Section 19a, Article I of the Ohio Constitution.

■■■ Plaintiff has further argued that R.C. 2125.02(A)(3)(b)(iii) infringes on the fundamental right to marry. The Supreme Court of the United States has recognized the right to marry as being a fundamental right protected by the Due Process Clause: "The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia* (1967), 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010, 1018. In *Zablocki v. Redhail* (1978), 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618, the court dealt with a challenge to a Wisconsin statute on the ground that it deprived the plaintiffs of the fundamental right to marry in violation of the Due Process and Equal Protection Clauses. The statute at issue permitted a noncustodial parent who owed an obligation of support to a minor child to legally marry only if he or she submitted proof of compliance with support obligations and demonstrated that the minor child was not and was not likely to become a ward of the state. The court held that a statute which directly and substantially interfered with the decision to marry would be upheld only if it was supported by sufficiently important state interests and was closely tailored to effectuate those interests. *Id.* at 386–388, 98 S.Ct. at 681–682, 54 L.Ed.2d at 631. The court went on to say, however, that regulations which do not "significantly interfere" with the decision to marry "may be legitimately imposed." *Id.* at 386, 98 S.Ct. at 681, 54 L.Ed.2d at 631. As an example of a regulation which does not "significantly interfere," the court pointed to the regulation at issue in *Califano v. Jobst* (1977), 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228. In *Califano,* the court addressed the constitutionality of provisions of the Social Security Act that provided for the termination of a dependent child's benefits upon marriage to an individual who was not entitled to benefits under the Act. The *Zablocki* court found that these provisions did not impose a "direct legal obstacle in the path of persons desiring to be married." *Id.* at 387, 98 S.Ct. at 681, 54 L.Ed.2d at 631, fn. 12. In contrast to its decision in regard to the regulation at issue in *Califano,* the court found that the Wisconsin statute interfered directly and substantially with the right to marry. *Id.* at 387, 98 S.Ct. at 681, 54 L.Ed.2d at 631.

As in the case of the regulation at issue in *Califano,* R.C. 2125.02(A)(3)(b)(iii) does not directly and substantially interfere with the right to marry. While this statute may have some incidental effect on the decision to marry, it does not directly prohibit or discourage marriage and, therefore, does not infringe on the fundamental right to marry.

Plaintiff has asserted that, even if R.C. 2125.02(A)(3)(b)(iii) does not infringe on the fundamental right to marry, it is nevertheless a violation of the Due Process and Equal Protection Clauses because it lacks a rational basis. In determining whether a statute or classification has a rational basis, a court must ask if it is rationally related to a legitimate state interest. *Ohio Bur. of Emp. Serv. v. Hodory* (1977), 431 U.S. 471, 489, 97 S.Ct. 1898, 1908–1909, 52 L.Ed.2d 513, 527. Plaintiff has argued that the state has no rational basis to treat surviving spouses who remarry differently from those who simply cohabit with another person.

The state has a rational basis for treating surviving spouses who remarry differently from those who live with another person. The state has a legitimate interest in ensuring that a surviving spouse receives a fair and just award for the wrongful death of a spouse. The legislature could reasonably have concluded that the surviving spouse's remarriage has a more permanent and substantial effect on his or her compensable losses than the act of cohabiting with another and, therefore, that the act of remarriage is more relevant to a determination of losses. Plaintiff's second assignment of error is overruled.

## C

Plaintiff's third assignment of error is that the trial court erred in overruling his objections to questions regarding how long he had known his second wife, what services she performed for the family, and whether she was employed outside the home. On cross-examination of plaintiff, attorneys for defendants asked him about his remarriage:

"Q: How long had you known [your second wife]?

"[Plaintiff's Counsel]: Objection.

"The Court: How long were you what?

"[Defense Counsel]: How long had he known [his second wife].

"The Court: Yeah, I'll sustain the objection. No, I won't. I'll overrule the objection.

"A: About two months.

"Q: So you met her sometime—

"A: About a month after [Cynthia Pena] passed away.

"Q: And you have been married now to [your second wife] for almost five years?

"A: Yes.

" * * *

"Q: What services does your new wife * * * provide around the home?

"[Plaintiff's Counsel]: Objection.

"The Court: I'll overrule it.

"A: House services like a wife would do, cleans, cooks.

"Q: She does the things [Cynthia Pena] used to?

"A: Some, not all.

" * * *

"Q: With regard to your new wife * * * has she been employed during the marriage?

"[Plaintiff's Counsel]: Objection.

"The Court: Overruled.

"A: She hadn't been since last May.

"Q: She's not been since last May?

"A: Right.

"Q: But from the time of the marriage on what, June 16th, 1989 until you had your child, she was employed?

"A: She was employed up until last May."

 Plaintiff has argued that these questions were improper because R.C. 2125.02(A)(3)(b)(iii) permits a defendant to present evidence only of the fact of remarriage, not evidence of the circumstances of the remarriage. This court cannot accept plaintiff's assertion. A holding to this effect would severely limit the ability of the trier of fact to assess the effect of a remarriage on the surviving spouse's compensable damages. The purpose of R.C. 2125.02(A)(3)(b)(iii) is to permit the jury to consider not only the fact of remarriage, but also the circumstances of the remarriage which the trial court determines are relevant to an assessment of the surviving spouse's losses.

 A trial court's determination of which questions regarding the circumstances of remarriage are relevant to the jury's assessment of damages will not be disturbed on appeal absent an abuse of discretion. See *Renfro v. Black* (1990),

52 Ohio St.3d 27, 32, 556 N.E.2d 150, 154–155. The trial court did not abuse its discretion in finding that questions relating to how long plaintiff had known his second wife, what services she performed for the family, and whether she was employed outside the home were relevant to the jury's assessment of how plaintiff's remarriage affected his compensable losses under the wrongful death statute. Plaintiff's third assignment of error is overruled.

## D

Plaintiff's fourth assignment of error is that the trial court incorrectly instructed the jury, after it had returned a verdict of no damages on the two wrongful death claims, that it must return verdicts of "at least one dollar" and funeral expenses on both claims. In light of this court's disposition of plaintiff's first assignment of error, plaintiff's fourth assignment of error is moot. If this assignment of error were not moot, it would still be overruled because plaintiff waived any right to assert that the trial court's instruction was error.

Before the trial judge instructed the jury, he asked counsel for plaintiff and defendants if it would be error for him to instruct the jury that they must award "at least one dollar." Counsel for plaintiff responded that he thought it would be error, but he did not state why it would be error or suggest to the court what an appropriate instruction would be. Plaintiff's counsel also did not object to the charge as it was given.

Civ.R. 51(A) provides:

"On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."

Plaintiff's attorney's statement that "I think it is [error]" does not comply with the requirements of Civ.R. 51. Plaintiff did not state specifically the grounds for thinking the charge would be error nor did he formally object to the charge as given. Accordingly, plaintiff waived any right to claim as error the trial court's charge. Plaintiff's fourth assignment of error is overruled.

## E

Plaintiff's fifth assignment of error is that the trial court incorrectly granted defendant Josef F. Korinek, M.D. a directed verdict. At the close of plaintiff's case, Korinek moved the court for a directed verdict on the ground that plaintiff had failed to establish that he owed a duty to Cynthia Pena. After hearing argument from counsel, the trial court granted Korinek's motion on the

ground that reasonable minds could not conclude that he owed a duty to Mrs. Pena:

"I'll allow the motion on grounds, not of intervening cause, none of that. I'm allowing it simply on the state of the evidence, that Dr. Korinek did not appear to cover for anybody. He testified that he was not covering, that he did not take pregnant women as patients. He said, as I recall, that based on information he had, the lady, Cynthia Pena, was a very sick lady and as a physician he would have admitted her to the hospital under those circumstances, but he denies any, any connection with the case whatsoever."

Civ.R. 50(A)(4) provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

A trial court cannot consider the weight of the evidence or the credibility of the witnesses in ruling on a party's directed verdict motion. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178, 423 N.E.2d 467, 469. Rather, the court must deny the motion " 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions.' " *Id.* at 284–285, 21 O.O.3d at 178–179, 423 N.E.2d at 469, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 244, 363 N.E.2d 367, 368.

To maintain a successful wrongful death action, a plaintiff must show (1) the existence of a duty owed to the decedent, (2) breach of that duty, and (3) that the breach was the proximate cause of the death. *Oiler v. Willke* (1994), 95 Ohio App.3d 404, 408, 642 N.E.2d 667, 669–670, citing *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449. In a medical malpractice case, the existence of a duty is dependent on whether there was a physician-patient relationship. *Ryne v. Garvey* (1993), 87 Ohio App.3d 145, 155, 621 N.E.2d 1320, 1326–1327. A physician owes his patient the duty to treat him or her in a manner that a physician of ordinary skill, care, and diligence would under similar circumstances. *Oiler*, 95 Ohio App.3d at 408, 642 N.E.2d at 669–670.

Cynthia Pena went to the emergency room of defendant St. Joseph Hospital & Health Center ("St. Joseph") on March 12, 1989. She was examined by defendant Brian Kirkland, D.O. Kirkland determined that Mrs. Pena should be admitted to the hospital. Because emergency room physicians at St. Joseph did

not have authority to admit patients to the hospital, Kirkland instructed an emergency room employee to contact Mrs. Pena's physician so that Mrs. Pena could be admitted to his or her service.

At the time Mrs. Pena registered at the main desk of the emergency room, she listed Dr. Ramon Castro as her family physician. The hospital unsuccessfully attempted to reach Castro. The hospital then attempted to contact a Dr. Yuzon. When Castro had applied for reappointment to the medical staff of St. Joseph, he had listed Yuzon as his alternate physician. Yuzon was unavailable, but the hospital did eventually reach the answering service of defendant Josef F. Korinek, M.D., who was covering for Yuzon on March 12, 1989.

Korinek returned the hospital's call. Kirkland testified that he spoke to Korinek and informed him that a pregnant patient of Castro's was in the emergency room with a rash that was most likely chickenpox. He also testified that he informed Korinek that he was concerned about Mrs. Pena's nutrition and hydration. At trial, Korinek recalled having received a call from a man at St. Joseph, but he could not state whether it was Kirkland. He testified that a male voice from the hospital told him that a pregnant patient of Castro's was in the emergency room and needed to be admitted to the hospital. Korinek stated that he told the man on the phone that he was not covering for Castro and that the hospital should not admit the patient to his service because he would not accept patients who were having pregnancy difficulties. He testified that he recommended that the hospital locate Castro or contact the patient's obstetrician/gynecologist.

Korinek admitted that he was covering for Yuzon on March 12, 1989. He denied, however, that he was covering for Castro's patients. Korinek testified that it was an obligation of every physician who was leaving town or who would be unavailable for some reason to contact an alternate physician and request cover for his or her patients. He stated that Castro never informed Yuzon or Korinek that he would be unavailable on March 12, 1989, or requested cover for that day. At trial, Castro's deposition was read to the jury. Castro testified that he had made arrangements for Yuzon and his associates to cover for his patients on March 12, 1989. Korinek was an associate of Yuzon on March 12, 1989.

At trial, Kirkland denied that Korinek had told him that he was not covering for Castro or that he did not treat pregnant patients. He testified that Korinek never told him to locate Castro or to admit Mrs. Pena to the service of an obstetrician/gynecologist. He further testified that Korinek gave him permission to admit Mrs. Pena to Castro's service.

Korinek testified that he did not order the hospital to admit Mrs. Pena to Castro's service. On cross-examination, however, he gave testimony which can

reasonably be construed as an admission that he did give the hospital permission to admit Mrs. Pena to Castro's service:

"Q: Doctor, you telephoned me after I sent a letter to you, didn't you?

"A: Right.

"Q: And I told—and you told me during that phone call that on an evening you picked up the phone and a person told you this is the emergency room at St. Joseph's Hospital and we think we need to admit this patient, and you said, well, go ahead and admit her, didn't you?

"A: Yes, something like that. I don't remember the exact word.

"Q: So you did agree with the person who called that the patient should be admitted?

"A: I did agree that if the patient needs to be admitted, should be admitted.

"Q: But I guess what you're saying is you didn't agree to admit the patient to your service or Dr. Castro's?

"A: I did not agree to admit the patient on my service because I am a gastroenterologist and I do not admit pregnant patients, but I did not say that I would not admit the patient on medical service if it's, in this case, Dr. Castro's service.

"Q: Well, you had no authority, from what you're saying, to admit this patient to Dr. Castro's, is that what you're saying?

"A: I may allow the, give the permission to the emergency room to admit the patient because the emergency room does not have permission to admit a patient.

"Q: And you may have given this permission with absolutely no intention on your own to come to the hospital and see her, correct?

"A: In case I would have been called that the patient is in critical condition and there is no other physician available, I would have come to see the patient."

After the conversation with Korinek, the hospital admitted Mrs. Pena to Castro's service. Korinek testified that he did not receive any other calls from the hospital regarding Mrs. Pena and he did not go to the hospital or call to check on her condition. No doctor checked on Mrs. Pena after she was admitted to the hospital until the morning of March 13, 1989.

Construing the evidence most strongly in favor of plaintiff, reasonable minds could have found that Korinek owed a duty to Mrs. Pena. Three factors supported a finding that plaintiff introduced sufficient evidence of Korinek's duty to Mrs. Pena to survive a directed verdict. First, although Korinek denied that he was covering for Castro on March 12, 1989, Castro testified that Yuzon and his associates were covering for him on that day. Korinek was admittedly an

associate of Yuzon on March 12, 1989. Second, Kirkland testified that Korinek never told him that he was not covering for Castro or that he would not treat pregnant patients. Kirkland, in fact, testified that Korinek gave him permission to admit Mrs. Pena to Castro's service. Finally, Korinek's testimony could reasonably be construed as an admission that he did give St. Joseph permission to admit Mrs. Pena to Castro's service. Accordingly, the trial court incorrectly directed a verdict in favor of Josef F. Korinek, M.D. Plaintiff's fifth assignment of error is sustained.

### F

██ Plaintiff's sixth assignment of error is that the trial court incorrectly failed to instruct the jury on the successive tortfeasor rule. Plaintiff has argued that the court should have instructed the jury that defendants Alexander H. Boye–Doe, M.D., Stephen B. Evans, M.D., and Harold D. Belizaire, M.D. are liable for the negligent acts of defendants Brian Kirkland, D.O. and St. Joseph Hospital if their negligence necessitated the acts and/or omissions of Dr. Kirkland and St. Joseph Hospital.

██ Even assuming, however, that the court erred in not giving the instruction, the error was harmless. Pursuant to Civ.R. 61, an appellate court must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." This court has previously defined the successive tortfeasor rule:

"The successive tortfeasor rule holds that the original tortfeasor is liable for the negligence of subsequent tortfeasors whose acts are necessitated by the original negligence." *Traster v. Steinreich* (1987), 37 Ohio App.3d 99, 100, 523 N.E.2d 861, 863, citing *Tanner v. Espey* (1934), 128 Ohio St. 82, 190 N.E. 229.

In order for the doctrine to apply, there must be an originally negligent party whose acts necessitated the negligent acts or omissions of others. *Traster* at 100, 523 N.E.2d at 863. Since the jury determined that Dr. Boye–Doe, Dr. Evans, and Dr. Belizaire were not negligent, their acts could not have been the basis for a verdict based on the successive tortfeasor rule. Accordingly, no harm resulted from the trial court's failure to give the instruction. Plaintiff's sixth assignment of error is overruled.

### III

Plaintiff's first and fifth assignments of error are sustained. Plaintiff's second, third, fourth, and sixth assignments of error are overruled. This matter is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment accordingly.*

BAIRD, P.J., concurs.

QUILLIN, J., concurs in judgment only.