[Cite as *Technical Constr. Specialties v. Cooper*, 2011-Ohio-5252.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 96021**

---

## TECHNICAL CONSTRUCTION SPECIALTIES

PLAINTIFF-APPELLANT

vs.

## STEVE C. COOPER, ET AL.

DEFENDANTS-APPELLEES

---

### JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-676571

**BEFORE:**  Blackmon, P.J., Stewart, J., and Boyle, J.

**RELEASED AND JOURNALIZED:**  October 13, 2011
**ATTORNEY FOR APPELLANT**

Daniel M. Walpole
411 Quaker Square
120 E. Mill Street
Akron, Ohio 44308

**ATTORNEYS FOR APPELLEES**

Michael J. Murray
Steven D. Shafron
Berkman, Gordon, Murray & Devan
55 Public Square
Suite 2200
Cleveland, Ohio 44113-1949

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} Appellant Technical Construction Specialties ("TCS") appeals the jury's verdict awarding $14,876.45 in damages in its favor, arguing the award is inadequate. TCS assigns the following errors for our review:

> **"I.   The verdict awarding $14,876.45 in damages to TCS was against the manifest weight of the evidence, and that portion of the verdict must be reversed."**

> **"II.   The trial court abused its discretion when it denied TCS's motion for a new trial as to the amount of damages the jury awarded."**

> **"III.   The trial court abused its discretion when it denied TCS's motion for a judgment notwithstanding the verdict as to damages."**

**{¶ 2}** Having reviewed the record and pertinent law, we affirm the award of damages. The apposite facts follow.

### Facts

**{¶ 3}** In August 2004, Entertainment USA, d.b.a. Christie's Cabaret, ("Entertainment") decided to renovate its nightclub located in Cleveland's flats.

**{¶ 4}** The new design eliminated the support beams inside the club, requiring the building to be supported by exterior pillars. Entertainment retained Summit Testing ("Summit") to analyze the soil around the club and sought bids from various vendors to install the exterior supports.

**{¶ 5}** On September 14, 2004, Entertainment's president, Steve Cooper, signed a contract with Technical Construction Specialties, Inc., d.b.a. Atlas Piers N.E.O. ("TCS") to install 45 helical piers to the depth of at least 45 feet below the existing grade. The agreed total cost for the work was $56,783.

**{¶ 6}** Work began on Monday, November 8, 2004. After installing the first pier, TCS realized there was a problem because the pier went in at a depth of 86 feet, almost twice the depth that was projected. The president of TCS, Edward Sheeler, informed TCS's project manager, David Rogers, of the problem. It was decided that TCS would install two more piers to form a triangular pattern to determine whether the depth of the first pier was limited to that one location.

**{¶ 7}** David Rogers was not on site for the placement of the two other piers because he was needed at a site located in West Virginia. While Rogers was gone, TCS

installed all of the stock it had on the job site to the depth of at least 80 feet. According to Sheeler, Rogers was aware TCS was continuing to drill, but did not tell TCS to stop. Rogers contends he did not know they continued to drill until he returned to the site on Wednesday, November 10, 2004, and TCS presented him with a change order in the amount of $51,000 for the purchase of more piers. This cost was in addition to the original contract price of $56,783.

{¶ 8} Rogers notified Steve Cooper that TCS had done the triangulation, but had also installed all the piers even though they were going in at least 80 feet, thereby, doubling the cost of the project. Steve Cooper was outraged and refused to pay the additional cost, arguing TCS was not authorized to use all the stock it had on site once it was aware the depth was much deeper than anticipated.

{¶ 9} As a result of the disagreement, Rogers scheduled a meeting for November 16, 2004 to discuss the additional cost and possible ways to rectify the design problem. The meeting was attended by Sheeler, Rogers, a representative from Summit, structural engineers from Huffman & Associates, and Entertainment's counsel. After the meeting, Sheeler sent Rogers a letter in which he recounted what had transpired at the meeting as follows:

{¶ 10} **"At that meeting, the man sitting next to you asked why we kept going when we knew that the pier depth was a problem. My response to you during our telephone conversation was that we did notify you that the first pier had run about 75'. I called you before the second pier was installed. I**

**also told you that we were going to install the second pier to see if we hit the same depth and you agreed. The next day, on Tuesday morning, we installed two more piers around the building to create a triangle. At about 10:30 a.m., I called you and told you that it seemed certain that all 45 piers would be going to 80+/-. You asked me for cost estimates, and I provided them to you over the phone, at that time and told you that I would be sending change orders out to you on Wednesday, so we pulled off the job at about noon. I am confident that we gave you any and all information as soon as possible."**

{¶ 11} The letter does not indicate that Rogers authorized Sheeler to continue with the job. According to Rogers, he could not authorize Sheeler to continue without Steve Cooper agreeing to the change order. Because Cooper refused to pay TCS, TCS removed all of its equipment including the piers it had installed. TCS then filed suit against Entertainment.

{¶ 12} TCS requested $48,366 in contract damages and an additional $7,213 for costs it incurred removing its equipment and material from the site. The jury awarded TCS $14,876.45 in damages. Thereafter, TCS filed motions for a new trial and for judgment notwithstanding the verdict ("JNOV"), arguing that the jury's award of damages was inadequate and against the manifest weight of the evidence. The trial court denied both motions.

**Inadequate Damages**

{¶ 13} We will address TCS's assigned errors together as they all concern whether the jury's verdict is supported by the evidence. TCS argues the verdict is against the manifest weight of the evidence and that the trial court erred by failing to grant its motion for a new trial or for JNOV.

## Standards of Review

{¶ 14} In determining whether a verdict is against the manifest weight of the evidence, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578. When reviewing the sufficiency of the evidence in civil cases, the question is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent, credible evidence. Id. Put more simply, the standard is "whether the verdict [is] one which could be reasonably reached from the evidence." *Hartford Cas. Ins. Co. v. Easley* (1993), 90 Ohio App.3d 525, 630 N.E.2d 6. When engaging in this analysis, an appellate court must remember that the weight and credibility of the evidence are better determined by the trier of fact. Id.

{¶ 15} A motion for new trial is governed by Civ.R. 59. TCS's motion was based on Civ.R. 59(A)(4), which provides that a trial court may grant a new trial based upon excessive or inadequate damages. The motion was also based on Civ.R. 59(A)(6), which allows a new trial where the judgment was not sustained by the weight of the evidence.

{¶ 16} The determination of whether or not to grant a new trial is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Pena v. N.E. Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 103, 670 N.E.2d 268, citing *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 184, 454 N.E.2d 976. A motion for a new trial is reviewed differently at the appellate level than at the trial level; a reviewing court must view the evidence in a light most favorable to the trial court's decision, rather than in favor of the nonmoving party. *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 423 N.E.2d 856. This court does not weigh the evidence in reviewing a decision on a motion for a new trial. *Mannion v. Sandel*, 91 Ohio St.3d 318, 2001-Ohio-47, 744 N.E.2d 759.

{¶ 17} The standard of review for a JNOV motion is the same as that for a directed verdict. Construing the evidence most strongly in favor of the party against whom the motion is directed, the motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor. Civ.R. 50; *D.O. Summers Cleaners & Shirt Laundry Co., Inc.* (1998), 81 Ohio St.3d 677, 679, 693 N.E.2d 271.

{¶ 18} Additionally, the assessment of damages is generally within the purview of the jury. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 655, 635 N.E.2d 331; *Weidner v. Blazic* (1994), 98 Ohio App.3d 321, 334, 648 N.E.2d 565. The jury's verdict will not be disturbed absent an affirmative showing of passion or prejudice. *Moskovitz* at 655. Passion or prejudice is shown where the jury's assessment of damages

is so overwhelmingly disproportionate as to shock reasonable sensibilities. *Pena* at 104. "The mere size of the verdict is insufficient to establish proof of passion or prejudice." Id.

## Analysis

{¶ 19} The contested issue in this trial was whether TCS had authority to proceed to install the remaining piers once it discovered the piers installed in the triangle formation was at a depth of at least 80 feet, which was almost twice the depth projected. TCS contends that Sheeler's discussions with Roger and Roger's failure to issue a stop work order, gave it the authority to proceed. However, the jury could have easily concluded that TCS should not be awarded damages beyond the triangulation and subsequent removal of the piers installed up to and including the triangulation because it was not authorized to proceed with the project once the triangulation showed the depth would be a problem at the entire site.

{¶ 20} David Rogers testified that after the first pier went in at the depth of 86 feet he discussed the problem with Entertainment President Steve Cooper. They agreed that a triangulation of the area should be done to determine the extent of the problem. Rogers testified that if the depth was going to be a problem throughout the design, they would then have the opportunity to create another design. Entertainment, however, never had the opportunity to discuss another design because TCS continued to install the entire stock of piers at the additional depth. In fact, by the time Rogers was given the change order, TCS had installed 15 additional piers.

**{¶ 21}** Although Sheeler of TCS contends he notified Rogers of the depth problem after the triangulation was performed, there is no evidence Rogers gave him permission to continue. According to Sheeler, Rogers told him to give him an estimate of how much it would cost to do the project at the additional depth. However, the jury could have concluded this was not permission from Cooper to proceed. In fact, Rogers testified that Sheeler was aware that Rogers was only the project manager, not the owner, and only had permission to authorize day to day issues, not material changes. Any material changes had to be submitted to Cooper for approval. According to Rogers, he did not receive the new estimate until he was given a change order request for the additional $51,000 in material. This was after TCS had installed the additional piers.

**{¶ 22}** TCS also claims the contract authorized it to proceed to install the piers because there was a provision in the contract quoting the cost of additional piers should they be required. However, it was within the jury's discretion to determine whether this provision applied to material changes that would result in doubling the costs of the contract or only applied to the occasional use of additional piers in completing the project. Moreover, if this provision is read to apply to even material changes to the contract, there would have been no need to perform the triangulation as the contract would have obligated Entertainment to allow TCS to continue with the project regardless of the additional cost.

**{¶ 23}** Based on this evidence, we conclude the jury could have reasonably determined that although Entertainment breached the contract by not paying TCS, TCS

was not entitled to all the damages it claimed.  There is no dispute that Entertainment authorized TCS to preform the triangulation; therefore, TCS should be paid for that work and possibly the cost for removing those piers. Unfortunately, because no special interrogatories were submitted to the jury, we are unable to conclusively determine what figures the jury used to calculate the damages.  "Proper jury interrogatories lead to 'findings of such a character as will test the correctness of the general verdict returned and enable the court to determine as a matter of law whether such verdict shall stand.'" *Bobb Forest Products, Inc. v. Morbark Industries, Inc.*, 151 Ohio App.3d 63, 2002-Ohio-5370, 783 N.E.2d 560, citing *Freeman v. Norfolk & W. Ry. Co.* (1994), 69 Ohio St.3d 611, 613-614, 635 N.E.2d 310.  However, based on the evidence, the $14,876.45 could be reasonably calculated from the evidence presented and was not based upon passion or prejudice.

{¶ 24} Thus, we conclude the court did not abuse its discretion in denying TCS's motions and the jury verdict was not against the manifest weight of the evidence. Accordingly, TCS's three assigned errors are overruled.

Judgment affirmed.

It is ordered that appellees recover from appellant their costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

MELODY J. STEWART, J., and
MARY J. BOYLE, J., CONCUR