DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Erie County Court of Common Pleas, which entered a judgment granting a new trial to appellees/cross-appellants Jessica E. Porter and William Porter.[1]
Because we find that the trial court abused its discretion in granting a new trial, we reverse the decision of the trial court.
 {¶ 2} This case arises out of a one-car accident that occurred on December 30, 1997. It is undisputed that the driver, appellant/cross-appellee Kelly Keefe,[2] fell asleep at the wheel. The car left the road and flipped over, causing injury to appellee, the passenger. (It is undisputed that appellee suffered a "non-displaced" fracture of the C1 vertebrae as a direct result of the accident. The cause of her other injuries were disputed.) The case went to trial before a jury, the trial lasting approximately five days. Thirteen witnesses testified. At trial, appellant admitted negligence, and the only issues submitted to the jury were proximate cause and damages. The jury awarded the full amount of the medical expenses ($14,292.25) and an additional $10,000 for pain and suffering. The jury awarded nothing for future medical expenses. Following the verdict, appellees moved for a new trial, and the trial court granted the motion. The trial court indicated in its decision that it granted the motion based on Civ.R. 59(A)(4) (inadequate damages as a result of passion or prejudice) and Civ.R. 59(A)(6) (verdict not sustained by "weight of the evidence"). This appeal followed.
 {¶ 3} Appellant raises the following assignment of error for our review:
 {¶ 4} "The trial court abused its discretion and committed reversible error by interfering with the jury verdict and granting a new trial where the jury award did not constitute inadequate damages and is not against the manifest weight of the evidence."
 {¶ 5} Appellees have filed a cross-appeal, and they raise the following assignments of error for our review:
 {¶ 6} "1. The trial court erred as a matter of law in failing to grant a new trial on the basis of irregularity in the proceedings of the court. (Judgment entry at p. 1)
 {¶ 7} "2. The trial court erred as a matter of law in failing to grant a new trial on the basis of accident or surprise. (Judgment entry at p. 1)
 {¶ 8} "3. The trial court erred as a matter of law in failing to grant a new trial on the basis of newly discovered evidence. (Judgment entry at p. 1)"
 {¶ 9} Appellees presented the testimony of eight witnesses in their case-in-chief. The first witness, Trooper Shawn Wiley, was one of the officers who responded to the scene of the accident. He indicated that, according to his records, the accident occurred at approximately 3:05 p.m. and he arrived at the scene at about 3:20 p.m. When he arrived, a sheriff's deputy was working in and around the car and an ambulance was either there or arrived shortly thereafter. He did not recall whether appellee was conscious or unconscious when he came upon the scene. Trooper Wiley testified that he took a statement from appellant, who indicated that both she and appellee were wearing seatbelts (though one hospital record inexplicably indicated that appellee was "unrestrained"). Finally, Trooper Wiley identified for the record several photographs of the accident scene as well the measurements he took at the site.
 {¶ 10} Next, appellee called Rebecca Burkhart, a family friend, to testify. Burkhart testified that she knew the Porter family from church, and she testified as to all of the physical activities in which she had engaged with appellee before the accident, including horseback riding, roller skating, swimming, and taking long walks. Burkhart testified that appellee and her family lived on a small farm, and she and appellee had played with the many animals on the farm. She described appellee as being very friendly and happy before the accident, and she indicated that appellee's plans for the future were to be a veterinarian, a teacher, or a caseworker. Burkhart also explained that she had seen appellee play in the school band, a lively band that performed "dance routines" while playing their instruments.
 {¶ 11} Burkhart explained that she visited with appellee just days after the accident, and she observed appellee in a neck brace. In contrast to her demeanor before the accident, appellee was, according to Burkhart, "down" after the accident; she was tearful and "very depressed." Burkhart testified that she spent at least one night with appellee, and she knew that appellee had trouble sleeping because of the pain. As for the impact of the accident on appellee's life, Burkhart testified that since the accident, appellee continues to be depressed, and she has headaches. She testified that appellee has not ridden horses since the accident and has not been able to hold down a job because of her headaches. Appellee was also "very upset" and "depressed" because she had to finish her senior year in high school with a tutor.
 {¶ 12} Dr. Laurel Schauer, a clinical psychologist, testified for appellee via videotape. According to Dr. Schauer, a social worker in the neurology department at Metro Health Medical Center ("Metro") had referred appellee to Schauer because appellee was experiencing "intense reactions" following the accident. (Appellee had been patient at Metro following the accident.) Dr. Schauer first saw appellee on March 10, 1998. Appellee reported that she was suffering from mood swings, nightmares, worry, and trouble sleeping. She was also having a difficult time "reintegrat[ing]" back at school. The problems with her schoolmates stemmed from them not taking appellee's condition or symptoms seriously.
 {¶ 13} In order to facilitate appellee's treatment, Dr. Schauer took a psychosocial history from appellee. She learned that appellee was a junior in high school and that she lived with her father and younger sister on the farm. Her parents had divorced some years earlier. In terms of appellee's life before the accident, appellee reported to Dr. Schauer that she (appellee) was active in the school band, she liked sports, she frequently rode horses, and she had many household responsibilities. Dr. Schauer's initial impression was that appellee was "a girl with enormous competencies, who did very well and expected to do very well, in general, who was considerably struck and undone by the effects of the accident, and the loss of her skills and loss of her abilities." Dr. Schauer also noted, however, that appellee "described many positives in her situation. She saw her relationships with others as generally positive and her school potentials as also very positive." Taking into account the facts of the accident and appellee's injuries, and based on appellee's post-accident experience of nightmares, mood swings, and insomnia, Dr. Schauer diagnosed appellee with adjustment disorder and anxiety. Dr. Schauer also expressed her opinion that some of appellee's problems stemmed directly from appellee's experience of the accident itself and some stemmed from the pain and distress following the accident.
 {¶ 14} Dr. Schauer's treatment of appellee continued for five sessions; her goal was to help appellee with her symptoms and her stress and to help appellee with the transition back to her normal activities. At the time of her second appointment, appellee reported that her nightmares were decreasing, though she was still experiencing anxiety in the form of repeated memories of the accident. By this time, appellee had returned to school, but she was having difficulty catching up with the work and was tired. Dr. Schauer testified that she did not believe that the school had a good plan to accommodate appellee's adjustment at school. At the request of William Porter, she wrote a letter to the school asking that appellee's workload be decreased. Dr. Schauer explained in the letter that appellee had been staying up too late at night to try to finish her school work and that appellee's long hours were not "optimal" for "recovery and function." However, she also explained in the letter that appellee's distress was diminishing, that she was "returning to her usual routine, as would be expected," and that "there is no interference with daily life expected." She also expressed her opinion in the letter that if appellee's load was decreased, it would be more realistic that appellee would "be at full function in September." On the same day, Dr. Schauer wrote a letter to William Porter asking him to also reduce appellee's workload at home and to encourage her to get more sleep.
 {¶ 15} Appellee reported some improvement both physically and emotionally by the time of her third visit. At the fourth visit, appellee complained of headaches, which had increased upon her return to school. Appellee believed that the headaches were due to prolonged periods of sitting in school, and she had recently left school for home tutoring.
 {¶ 16} She continued to have anxiety, trouble sleeping, and difficulty getting along with her schoolmates. She had begun to see a new neurologist, Dr. Bauer. At this time, Dr. Schauer "upgraded" appellee's diagnosis to post-traumatic stress disorder. Dr. Schauer arrived at this diagnosis because appellee continued to have "persistent, recurring thoughts of the accident," because appellee had difficulty getting into cars, because she wanted to avoid the accident site, and because she continued to have sleep problems. Again, Dr. Schauer expressed her opinion that these symptoms were caused by the accident.
 {¶ 17} At the fifth and final visit, which occurred in the fall of 1998, appellee's senior year in high school, appellee reported that she had quit the band, that she was receiving home tutoring, that she continued to feel isolated from her schoolmates, and that she was regularly seeing Dr. Bauer, the neurologist. Dr. Schauer's diagnosis remained the same — post-traumatic stress disorder. Further, Dr. Schauer offered her opinion that appellee's inability to return to school was "demoralizing" and "depressing" for appellee because it increased her isolation and prevented her from returning to her "prior competence." Dr. Schauer testified that, as of her last appointment with appellee, she believed that appellee had on-going psychological problems and that she should continue treatment.
 {¶ 18} On cross-examination, Dr. Schauer admitted that the referral from Metro indicated that, in addition to appellee's reaction to the accident, family issues may have also played a part in appellee's condition. Dr. Schauer testified that she understood that factors outside of the accident existed. Dr. Schauer also discussed that appellee attended a pre-planned, pre-paid band trip to Florida in February 1998, a couple of months after the accident, and that appellee experienced problems with her schoolmates on this trip. The schoolmates apparently did not take appellee's injuries seriously.
 {¶ 19} Dr. Schauer was questioned on cross-examination about factors outside the accident that might have contributed to appellee's emotional distress, and Dr. Schauer explained that in September 1998, the fall of appellee's senior year in high school, appellee's parents were involved in a custody dispute concerning appellee's younger brother. She also testified that appellee's problems with her peers continued into the fall of her senior year, and when Dr. Bauer suggested that appellee leave school and return to home tutoring, appellee was "somewhat relieved." According to Dr. Schauer, once appellee returned to home tutoring in the fall of her senior year, appellee appeared to be more positive in her outlook.
 {¶ 20} On redirect examination, Dr. Schauer clarified that the custody dispute involving appellee's brother, while stressful to appellee, did not cause appellee to suffer from post-traumatic stress disorder; the post-traumatic stress was the result of the accident.
 {¶ 21} Appellee's next witness was Charlene Kurko, who tutored appellee during appellee's senior year in high school. Kurko testified that appellee was a conscientious student. She also stated that on several occasions when she was working with appellee, appellee would indicate that she was having headaches, and they would cut their sessions short. Appellee would then complete the material on her own and bring it with her to their next session.
 {¶ 22} Denise Reilly, appellee's music teacher and band leader, also testified on appellee's behalf. Reilly explained that the marching band was a high-step band, that the routines were physically very challenging, and that appellee enjoyed playing in the band before the accident. She also testified about the band field trip to Florida in February 1998. She explained that the trip cost about $800 to $900 per student, with each student contributing about 90 percent of the cost. The trip was prepaid several months in advance, and if a student could not go, the student forfeited her money unless she could sell the seat to someone else. Appellee elected to go on the trip, and Reilly testified about the accommodations that they made for her. A wheelchair was arranged, and both freshman students and appellee's hotel roommates helped with her luggage. This caused some resentment, as the students grew tired by the end of the trip of carrying appellee's luggage. Reilly testified that appellee engaged, in a limited sense, in most of the activities, whenever the location or event could accommodate her wheelchair. However, appellee could not participate in the parade in which the band marched, which Reilly agreed was the highlight of the trip.
 {¶ 23} Dr. William Bauer, appellee's neurologist, testified by videotape. Dr. Bauer began treating appellee in September 1998, when he evaluated her for neck pain and headaches. Provided with the facts of the case (a rollover car accident) and the undisputed injuries (lacerations, a hematoma, and a C1 fracture), Dr. Bauer expressed his opinion that the injuries were caused by the car accident. Dr. Bauer also explained a little about the fracture and how such a fracture could potentially be very dangerous. According to Dr. Bauer, the spinal cord comes down through the skull and into vertebra C1 through C7. Therefore, a fracture of the C1 vertebra could compromise the spinal cord in a way that could "render the patient totally paralyzed." In short, Dr. Bauer considered this to be a serious injury. Dr. Bauer also explained about the collar that appellee was required to wear for three months following the surgery. The collar immobilized the neck 24 hours a day, seven days a week, for 12 to 14 weeks to give the fracture a chance to heal.
 {¶ 24} At her first visit with Dr. Bauer, appellee filled out a summary of her medial complaints. Appellee explained that her problems began with the accident, had continued ever since, and had worsened upon returning to school and band She explained that she was unable to function in school or in sports. She reported headaches that interfered with her sleep and her school work, and she indicated that she was taking pain medication and a muscle relaxer. Appellee also indicated in the questionnaire that her pain interfered with school activities, such as sports and band, that she could no longer go horseback riding, and that the medication, while helpful for the pain, made her very drowsy and "unable to function in daily things."
 {¶ 25} Upon examination, Dr. Bauer noted that appellee experienced tenderness in the muscles running from the neck down the back to the lumbar region, which, to Dr. Bauer, indicated muscle injury. He also found in his exam what he described as "abnormally brisk reflexes in the legs." Based upon his exam, it was Dr. Bauer's opinion that appellee sustained injury to her "brain, neck muscles, and spinal cord" which was causing "traumatic brain injury" and "concussive posttraumatic vascular headaches." Dr. Bauer also diagnosed appellee as having cord contusion. He explained that posttraumatic vascular headaches are similar to migraine headaches except that they are caused by trauma. According to Dr. Bauer, cord contusion occurs when force from a fracture is applied to the spinal cord. Dr. Bauer's treatment plan was to prescribe medication, conduct testing, and, in time, to consider rehabilitation. To carry out the treatment plan, Dr. Bauer prescribed several medications for the headaches and muscles. He specifically mentioned six different medications. He also testified that he requested that appellee not attend school, and she was, in fact, tutored for much of her senior year.
 {¶ 26} In terms of testing, Dr. Bauer ordered an EEG. The EEG showed some "sharp activity," which Dr. Bauer considered to be "slightly abnormal" and consistent with posttraumatic vascular headache. Dr. Bauer also conducted a test for "evoked potentials." This test showed an abnormality that would be consistent with an injury to the brachial plexus. The brachial plexus is a group of nerves running from the neck that supply the chest, the "wing bone," the arm, and the hand According to Dr. Bauer, the brachial plexus injury was causing appellee's aching, numbness, and weakness. Appellee apparently did not report this numbness and weakness until 2001, some three years after the accident. However, Dr. Bauer explained that the nervous system registers only the greatest pain level; it does not register all of the pain levels at once. Therefore, if the posttraumatic vascular headaches presented greater pain than the brachial plexus, the brachial plexus pain would not register. However, once the headaches began to subside, the brachial plexus pain appeared. According to Dr. Bauer, the brachial plexus pain was always there; it was just "subclinical."
 {¶ 27} Dr. Bauer also discussed appellee's depression, expressing his opinion that the depression is directly related to the traumatic brain injury. He also testified that, despite all of appellee's treatment and her counseling, it is not unusual that she still has symptoms. Dr. Bauer explained that the recovery time for brain injuries is very slow, taking months and sometimes years to heal.
 {¶ 28} In terms of appellee's prognosis, Dr. Bauer testified that appellee will continue to experience headaches, neck pain, shoulder pain, arm pain, and back pain for several years and possibly forever. Nevertheless, he indicated that the pain can be eased by medication and rehabilitation. (However, he did not believe that, at the time of trial, appellee was ready for rehabilitation.) Finally, Dr. Bauer testified that, in his estimation, appellee's injuries had a significant impact on her life.
 {¶ 29} On cross-examination, when presented with the fact that appellee scored a perfect 15 out of 15 on the Glasgow coma scale (which measures verbal, visual, and motor responses), Dr. Bauer responded that this test is "not a good scale for measuring this type of injury." Similarly, when presented with the fact that appellee's brain CAT scan was negative, Dr. Bauer responded, "It's another worthless test for brain injury." Appellant's counsel also asked,
 {¶ 30} "Well, in addition, it was noted by the doctors at Metro that Jessica neurologically, both from the motor and the and sensory side, that she was noted to be intact. That's a good finding, isn't it, for her nervous system"? Dr. Bauer responded,
 {¶ 31} "It's a good finding for the person making the finding. It may not be good for the person who's got the brain injury." Dr. Bauer did agree that appellee did not complain of headaches to her previous doctors until several months after the accident, but he responded, first, that the headaches, at that point, did not register because they were not the highest level of pain. He also opined that the doctor conducting the examination was a "fledgling" whom he would have "scold[ed] for having done a very poor history." The medical records showing no report of headaches were, according to Dr. Bauer, "rubbish."
 {¶ 32} Dr. Bauer also agreed on cross-examination that appellee's neck fracture was healed in July 1998 (some seven months after the accident), that appellee did not complain about arm pain until May 19, 2000 (two and one-half years after the accident), and that appellee did not complain about leg pain until May 2001 (three and one-half years after the accident). However, Dr. Bauer still attributed the headaches and the leg and arm pain to the accident. Finally, Dr. Bauer admitted that he did not see appellee from October 1999 to May 2000. When asked whether appellee could have suffered a different injury during that period that would account for her subsequent leg and arm pain, Dr. Bauer responded that it was possible but that he did not think that this was the case.
 {¶ 33} On re-direct examination, Dr. Bauer agreed that there was no notation of the brachial plexus injury until May 2000, but again reiterated his belief that the "nervous system focuses on the greatest level of pain," which, until that time had been the neck pain and the headaches.
 {¶ 34} William Porter, appellee's father, was the next witness. He explained a bit about their family and its history. Appellee was born in 1981, her sister in 1983, and her brother in 1988. He and appellee's mother divorced in 1985, remarried in 1987, and divorced again in 1991. Approximately a year after the second divorce, when appellee was about 11 years old, she went to live with her father. One by one, the other children came to live with him as well. When asked about the possibility that appellee's problems stem from her "troubled youth," Porter acknowledged that appellee was saddened by the last divorce but that she got over it and was doing well, emotionally, at the time of the accident. He explained that appellee liked school very much and was an average student.
 {¶ 35} In terms of their home life, Porter explained that they live on an 18-acre farm and they own horses, pigs, goats, cats, and dogs. Porter stated that appellee loved horseback riding and that she took complete care of the horse herself. She also took care of the other animals by feeding them, cleaning their stalls, and so forth. She had yard and household responsibilities as well. He also testified as to the numerous extracurricular activities in which appellee participated at school.
 {¶ 36} After describing the frightening events surrounding the accident, Porter explained how he decided that appellee would wear a rigid neck collar instead of a "halo" that screwed into the skull. However, appellee was required to wear the collar 24 hours a day for three months, not even being able to take it off to wash her hair. Appellee was also unable to return to school while she was wearing the collar.
 {¶ 37} Porter testified that appellee was in a great deal of pain following the accident and that she took pain medication to ease it. He testified that he went with her for her first follow-up appointment at the hospital and described it as rather cursory. He testified that, though it was not recorded, appellee did complain of headaches at this first visit. He indicated that she saw a different doctor on her second visit and it proceeded much the way the first did. Porter testified that, because his daughter was having problems with nightmares, insomnia, fear of getting into cars, and fear of going by the accident scene, he called the hospital, and personnel there referred appellee to Dr. Schauer. She began seeing Dr. Schauer when she returned from the band trip to Florida.
 {¶ 38} Regarding the trip to Florida, Porter testified that appellee returned unhappy because she was unable to fully participate in the activities and because she was having problems with her schoolmates.
 {¶ 39} According to Porter, his daughter wore the collar continuously as prescribed (except when a physician took it off briefly at the third follow-up visit), and she took her pain medication every four hours as instructed. Because she was not allowed to return to school while wearing the collar, she received tutoring. In April 1998, the hard collar was removed and appellee began wearing a soft collar. She returned to school at that point. Appellee had difficulty returning to school as she had headaches and other pain, and she starting falling behind. In an attempt to keep up with the work, she stayed up too late and rose too early. She soon stopped going to school and resumed working with a tutor.
 {¶ 40} During the summer of 1998, some six months after the accident, appellee felt a little better as she had less stress and could get more rest. She spent her time out in the barn grooming the animals but did nothing strenuous.
 {¶ 41} In the fall of 1998, appellee once again returned to school, but she again fell behind and had to leave and resume working with a tutor. Porter testified that appellee missed going to school, but she was able to graduate with her class. When asked at trial to describe his daughter, Porter testified that appellee feels as if she has failed, and she is unhappy because she did not complete her plan of going to college to be a veterinarian. In general, he believes that she is less happy than she used to be. She continues to have headaches and neck, shoulder, and arm pain. He also testified that appellee's total medical bills were $14,735.53 up to the time of trial, a portion of them having been paid by insurance.
 {¶ 42} On cross-examination, counsel explored appellee's home life. Porter testified that, since his second divorce from appellee's mother, she has been married twice. At the time of the accident, appellee's mother was only "marginally involved" in appellee's life, though by the time of trial their relationship had improved. Porter acknowledged that there was a custody dispute over the couple's son, and he also acknowledged that appellee indicated in 1998 that she was bothered by the dispute.
 {¶ 43} Reviewing appellee's school records, Porter admitted that his daughter missed 22.5 days of school during her freshman year in high school (before the accident), but he stated that about two weeks of this time was accountable to appellee's foot surgery. He also admitted that she missed 17 days of school during her sophomore year due to colds and the flu. When asked whether appellee has had any other injuries since the accident, including "bruises, cuts, anything * * *," Porter denied that she had.
 {¶ 44} Counsel then questioned Porter about a swimming party appellee attended in early February 1998 — a party that would be a subject of much discussion during the trial. The party, which took place before the February 1998 band trip, was for appellant's birthday. Porter testified that he knew appellee went to a party during that time, but he was not aware of any of the details. When asked on cross-examination whether he was aware that appellee drove to that party (which was during the time she was in the rigid collar and was not cleared to drive), Porter denied any knowledge of that. (Whether or not appellee drove to this party was a disputed subject throughout the trial.)
 {¶ 45} Appellee then testified on her own behalf. She described the activities she enjoyed before the accident. She testified that she liked school, she liked participating in church activities, and she liked spending time with her animals. She also discussed her health before the accident. According to appellee, she was basically a healthy individual who suffered only from common colds and flus. She also discussed her foot surgery, which caused her to miss several days of school during her freshman year. Besides the foot surgery, her only other surgery was a tonsillectomy as a child. Prior to the accident, she never had a problem with headaches, arm, neck, or leg pain.
 {¶ 46} Appellee admitted that her parents' divorce was hard for her, but by the time of the accident she had "dealt" with those feelings. In terms of her plans for the future, appellee testified that before the accident she wanted to be either a veterinarian or a teacher. She discussed the career plan that she created in high school, which was introduced at trial. According to the plan, she wanted to be an elementary school teacher.
 {¶ 47} Appellee then discussed the many responsibilities she had to her animals before she was injured. She testified that she enjoyed working with the horses, and she rode them whenever she had free time. She also testified that she enjoyed her pigs, which she bred for a while, her three goats, her three dogs, and her numerous cats.
 {¶ 48} Appellee next testified about the day of the accident. She indicated that after the car rolled and then came to a rest, she had a "sharp, searing pain" down her head and neck, she had glass on her, and she was bloody and cold. The emergency medical workers arrived and immobilized her neck, and she was then transported to Firelands Hospital by ambulance. She described her pain at the hospital as "horrible," the "worst pain" she had ever felt. After taking x-rays, doctors diagnosed a broken neck. She was given morphine and transferred to Metro. She was released from the hospital a couple of days later. She stated that her symptoms during the initial weeks after the accident were neck pain, headache, and muscle tension in her shoulders. She also had a "horrible" bruise on her knee, and lacerations on her arm, her hand, and her back. She took pain medication every four hours. She began to have nightmares.
 {¶ 49} Appellee then described her problems with her schoolmates on the band trip some six weeks later. Some were skeptical about the extent of her injuries and some were jealous of the attention given to her. Others resented the special accommodations that she received. She testified that she never removed her collar on the trip. On one day of the trip she was feeling so poorly that she stayed in the hotel the entire day.
 {¶ 50} After three months, appellee's collar was removed and she was given clearance to drive and to return to school. She testified that she did not drive before that time. Appellee indicated that she had trouble returning to school because she was drowsy from the medication and had headaches. She then returned to tutoring. She described the summer of 1998 much the way her father did.
 {¶ 51} Appellee then testified about her failed attempt to return to school during the fall of her senior year. Responding to the note in Dr. Schauer's file that appellee was "relieved" to leave school her senior year and get tutoring, appellee testified that she was not happy about missing out on her senior year, but she was relieved that tutoring would enable her to get her education and graduate with her class.
 {¶ 52} Appellee then testified about her first appointment with Dr. Bauer in the fall of 1998. She testified that at her first visit she indicated on a form that she had neck, head, and shoulder pain, and that these were the same pains that had persisted from the time of the accident.
 {¶ 53} Appellee described the handful of jobs she has held since the accident, and she explained how her symptoms made it impossible for her to keep any of these jobs. To conclude her testimony, appellee outlined all of the symptoms she had at the time of the trial. She testified that she had headaches (which she classified as the "worst part of [her] pain"), neck pain, muscle spasm in the shoulders, "electric shocks" going down her arm, and depression. In terms of her physical activities, she stated that she can take long walks and ride a bike. She no longer rides horseback or lifts weights. She continues to take five different medications.
 {¶ 54} On cross-examination, appellee was asked again about her family situation before the accident, and she acknowledged that she told Dr. Schauer that her sister was "non-supportive" of her and was perhaps a bit jealous of appellee because appellee came first to live with her father. She also indicated that she did not like her first step-father, to whom her mother was married at the time appellee came to live with her father. She also acknowledged that she testified in her deposition that she had seen three different psychologists between the ages of eight and 12. She testified that she consulted the psychologists about issues relating to her parents' divorce and the custody battle over her brother. She also agreed that she had seen her family doctor when she was 16 because she was dizzy and had fainted. She testified that this occurred because she had just begun her menstrual cycle.
 {¶ 55} Appellee was questioned about deposition testimony that she was in so much pain following the accident that she essentially just laid around for three months. Defense counsel asked her why, if she was in so much pain, she went to a swimming party the first week of February and got into the pool. Appellee testified that she did not know it was a swimming party and had not even brought her suit. However, a suit was found for her and she was "pressured" to get into the pool with the others. Appellee also responded: "I tried to do as much as I could." When asked whether she drove to the party, appellee responded: "As far as I can remember, I don't think I did. I can't really even remember the party that much; it's been four years. But as far as I know, definitely not, I can't drive with that on." Appellee was then shown photographs of the party and she acknowledged that the photographs show her in the pool in her neck brace. The jury was then shown a video of appellee in Florida on the band trip. In the video, appellee is in a van following the band as it marched in the parade. Appellee agreed that the video showed her waving from the van, but she denied, as defense counsel suggested, that her head was outside the window.
 {¶ 56} Appellee then testified about the Florida trip and the "resentment" and "jealousy" that the other students had toward her because of her special accommodations. When asked whether she thought it was inconsistent that she was not well enough to go to school but well enough to go to Florida, appellee responded that she did not think so.
 {¶ 57} Appellee also testified about her jobs. According to appellee, she took a job at a greenhouse working as a planter in early 1999. However, she discovered that this type of work gave her feelings of "electric shock" going down her arm. At Dr. Bauer's suggestion, she quit that job, and he placed certain restrictions on her: that she not sit or stand for more than an hour and that she not lift over five to ten pounds. These restrictions were still in place at the time of the trial in late 2001. Appellee testified that if she sits or stands for more than an hour her neck gets stiff, she gets a headache, and her shoulders hurt. Appellee then testified about another job she took — as a cashier at a dry cleaner. She testified that she was fired because she missed work due to the pain. During the time she worked at the dry cleaner, she suffered a black eye and other bruises from a sledding accident.
 {¶ 58} In terms of her activities, appellee clarified that, in addition to walking and riding a bike, she has tried to jog, she does the treadmill, and she has done the stair stepper at the gym. Anything else causes her pain. Appellee agreed that the shooting pain in her arm did not begin until May 2000, some two and one-half years after the accident, and she did not begin having leg pain seriously enough to report it until May 2001. She also agreed that she reported to Dr. Bauer in October 2001 that her headaches were under control. However, she testified that "they're not under control all the time." According to appellee, though the frequency of the headaches varies, around the time of trial she was getting them three or four times a week. Appellee acknowledged that she reported to a psychologist in August 2001 that things were overall better for her, at least emotionally. Finally, she testified that, in her opinion, she is unable to hold down a job.
 {¶ 59} William Porter was called again on redirect. He testified that appellee's complaints to her family doctor of dizziness and fainting at the age of 16 were due to her menstrual cycle and that she never had the kinds of complaints before the accident that she had after the accident. Finally, he testified that he did not report on cross-examination that appellee had suffered a black eye from the sledding accident because he did not think that this was the type of injury to which defense counsel was referring.
 {¶ 60} The first defense witness was Angie Gnidovech, appellee's supervisor at the dry cleaner. She testified that she hired appellee in October 2000. Gnidovech testified that appellee worked three days over a two-week period in October and did not come in on the fourth scheduled day. On the second day that she worked, after a weekend of moving, appellee came in to work with a black eye and a bruise on her arm. Gnidovech did not ask her about the bruises because she said that appellee was embarrassed about it. Gnidovech testified that appellee never told her about any physical problems, and she did not indicate on her application that she had any restrictions. Contrary to appellee's testimony, Gnidovech testified that she did not fire appellee and that appellee "would still be there if it were up to [her] because it's hard to get good people."
 {¶ 61} Patricia Ezell was the next witness to testify. Ezell was a parent of a fellow band student and a chaperone on the Florida trip. She testified about the tension between appellee and the other students on the trip. She related one incident where appellee and her companion had held up the entire bus because they had walked several blocks to get food instead of eating with the other students near the bus where they were supposed to. She also related that at Epcot Center she observed appellee walking behind her wheelchair while another student was riding in it. When asked whether appellee appeared to be in pain on the trip, Ezell testified, "She did everything else the other kids did." In fact, Ezell testified that she observed appellee dancing the "hokey pokey" with the other kids. On cross-examination, Ezell agreed that appellee did not do all of the things that the other students did because appellee spent one day in the hotel room in pain and because she did not actually march in the parade.
 {¶ 62} Camille Harris, a friend of both appellee and appellant, also testified. She was appellee's roommate on the Florida trip. Harris testified that, in high school, she considered herself appellee's best friend, and appellee never really talked about her plans for the future. As far as Harris knew, appellee did not have any plans for the future. Based on what she knew of appellee, she just "assumed" that appellee would never attend college. She also testified that she visited often at appellee's house, and she observed that William Porter often had to argue with appellee to get her to do her chores around the house. According to Harris, it was "really hard for him to get her to do anything." In terms of appellee's school record before the accident, she testified that appellee did not have good attendance at school and was absent, on the average, one day a week. With regard to appellee's responsibilities to her animals, Harris testified that, while appellee's animals were cared for, appellee was not "the kind of kid that would be out in the barn constantly." Like her household chores, according to Harris, William Porter had to argue with appellee to do her outside chores as well. Harris described appellee before the accident as "happy" but also as "argumentative."
 {¶ 63} Harris then testified about the Florida trip. Harris stated that she was with appellee when they held up the bus by walking several blocks to get food. Harris testified that, despite the fact that accommodations were made for appellee and chaperones would have gotten for her anything that she needed, appellee did, in fact, walk several blocks to get food. She also testified that appellee took her neck brace off "occasionally" when they were in their room, but she would always put it back on if someone came to the door. (This was during the three-month period that appellee was instructed never to take off her collar.) Harris also confirmed that at times others would ride in appellee's wheelchair and appellee would walk. Finally, Harris testified that appellee never complained of headaches or other problems on the trip.
 {¶ 64} Harris testified that one of the last times she saw appellee was at the Erie County Fair in 1998 or 1999 and that they talked for a "couple of hours." She testified that appellee never mentioned any physical problems and that she "was just perfectly fine, bouncing around."
 {¶ 65} On cross-examination, Harris admitted that, although she considered herself to be appellee's best friend in high school, she did not visit appellee either in the hospital or upon her return from the hospital. In fact, Harris did not see appellee until the Florida trip, some six weeks after the accident. She also testified that, in her opinion, she did not consider appellee to be an avid horseback rider; it was her impression from her discussions with appellee that appellee rode only about once every couple of months. Harris indicated that she was not interested in riding horses at appellee's house because, in her opinion, the horses were not ridden much and she thought it would be dangerous. She testified that the one time she tried to ride a horse at appellee's house, the horse would not stand still long enough to be saddled, and Harris was never successful in getting on the horse. She admitted that, at that point, she was not an experienced rider, but she was working on a horse farm so she was familiar with horse behavior.
 {¶ 66} Appellant was the next witness to testify. She described herself as a good friend of appellee's in high school. Like Harris, appellant testified that appellee did not seem to have any real plans for her future and she did not seem "overly motivated" about going to school. In terms of the career plan about which appellee testified, appellant indicated that it was a school requirement to create such a plan. She testified that appellee's school attendance was not good; according to appellant, "She wasn't there very much. I remember it seemed to be on Monday, she was absent a lot."
 {¶ 67} Appellant then testified about her swimming party in early February 1998, some six weeks after the accident. According to appellant, appellee drove herself to this party. When asked how she knew this, appellant responded that a couple of her friends could not come to the party because they did not have a ride, and appellee gave them a ride. She denied that she or anyone else pressured appellee to get into the pool. Appellant testified that appellee did not complain of any physical problems at the party and appeared to be having a good time. Appellant also testified about the photographs of appellee taken at the pool party. According to appellant, despite the fact that appellee indicated that she could not wash her hair for the three months that she was in the collar, her hair appeared to be wet in some of the photographs, and the water was over her collar in one of the photographs.
 {¶ 68} On cross-examination, appellant testified that before the accident appellee was happy — a "normal" kid. She agreed that appellee was active in high school in drama, french club, and band With regard to the swimming party, she testified that appellee arrived in a gray or silver minivan, though she admitted that she did not actually see appellee drive it. According to Keefe, she believed that appellee drove to the party because two friends said that they got a ride from appellee.
 {¶ 69} Dr. James Sander, a neurologist, also testified for the defense. He testified that he examined appellee in August 2000. His intent was to take a history, conduct an examination, and diagnose any "neurological deficits." His examination consisted of both a general physical examination and a neurological examination. The physical examination was normal, except that Dr. Sander detected a "bruit," which is a turbulent flow through an artery, heard on a stethoscope. However, because Dr. Sander detected no signs of poor circulation, he considered this finding clinically insignificant. Dr. Sander next conducted the neurological examination in which he tested each part of the nervous system. During this part of the exam, he noticed that appellee had a "depressed affect." He noted on the sensory portion of the neurological exam that appellee showed a decreased sensitivity to cold and to a pinprick on the right side of her body but not on the left. He testified that he knew of no "neuroanatomical condition" that would cause this decreased sensitivity on one side. He therefore concluded that it was a "non-neurologically generated sensory loss," which he has seen in patients who "have some psychological difficulties and either have a conversion disorder, which is a subconscious loss of sensation or motor function." He testified that he has also seen this symptom in people who are "malingering." After concluding the neurological exam, Dr. Sander found no evidence that appellee had any "cortical spinal tract abnormalities." In fact, he concluded that appellee had a "normal objective neurological examination, and her sensory examination was not consistent with a neuroanatomical defect."
 {¶ 70} Dr. Sander also reviewed appellee's medical records. He found it significant that the EMS report from the day of the accident indicated that appellee "awake, alert, and oriented times three" because, according to Dr. Sander, people who have a "significant" head injury are not awake, alert, and oriented times three. He also noted from the records that she remained awake, alert, and oriented throughout her transport to Metro, and she arrived at the hospital in the same condition. He also noted the hospital record indicating that appellee had a normal motor and sensory examination and a normal cranial nerve examination. That record also indicated that appellee did not complain at that time of numbness and tingling. Again, according to Dr. Sander, an individual with a significant brain or spinal cord injury would not have had normal exams. He also found significant in the records that, once at hospital, appellee scored 15 out of 15 on the Glasgow coma scale, which measures verbal, motor, and visual response. A perfect score of 15 indicates a normal exam. Given appellee's perfect score, Dr. Sander concluded that there was "minimal or no evidence of any significant traumatic injury." Dr. Sander also reviewed a report from a CAT scan taken of appellee's brain on the day of the accident. That was normal as well. Dr. Sander agreed that appellee suffered a C1 fracture of the vertebrae, but he testified that it had healed as of July 15, 1998 (some seven months after the accident) and is currently insignificant from a neurological standpoint.
 {¶ 71} Upon review of appellee's follow-up medical records, he noted that she did not complain of headache, numbness, and tingling until some time after the accident, and he testified that if an individual suffered an injury that would cause numbness and tingling, it would appear contemporaneous with the accident and persist until the injury healed.
 {¶ 72} Based on his the examination and review of the medical records, Dr. Sander concluded that the injuries appellee suffered as a result of the accident were lacerations and the C1 fracture, but she suffered no neurological injury. According to Dr. Sander, appellee's complaints of headaches, numbness, and tingling were not "proximate to the time of the injury" and were not related to the accident. In his opinion, appellee's present symptoms were the result of "somatization disorder," which he described as "a disorder where because of depression or other psychological problems, they are transferred from the brain into physical complaints, pain, headache, tingling, numbness, that kind of thing. It's a transference of symptoms from the mind into physical symptoms." He attributed her depression to her family problems.
 {¶ 73} Dr. Sander then reviewed Dr. Bauer's findings and conclusions. In short, he disagreed with Dr. Bauer's interpretation of certain tests and flatly disagreed that appellee had any injury to her brain, her spinal cord, or her brachial plexus. When asked whether appellee needed any further medical treatment for injuries she received as a result of the car accident, he responded that she did not — that the injuries resulting from the car accident were healed within seven months after the accident. And, except for treating the headaches, he found no neurological treatment necessary at all given that her neurological exams were all normal. He opined that appellee has nothing preventing her from working or otherwise functioning normally.
 {¶ 74} On cross-examination, Dr. Sander admitted that appellee reported to him that she suffered headache and neck and shoulder pain since the day of the accident. He also reviewed a medical record from July 1998 (seven months after the accident) which inexplicably indicated both that appellee reported daily headaches and that she denied headaches. He also admitted that, upon review of appellee's medical records, appellee did not suffer before the accident from any of the symptoms of which she complained after the accident. Finally, Dr. Sander testified that he considered it reasonable that a teenager with a fractured neck from a car accident, whose activities were severely curtailed and who was required to wear a hard collar for three months, would suffer mood swings, nightmares, and other emotional difficulties.
 {¶ 75} Dr. Bauer was called on rebuttal. He testified that one can have severe pain and still have a normal neurological exam — that technology does not at this point allow us to "objectively see" this pain. He also disagreed with Dr. Sander's diagnosis of somatization disorder, given the severe trauma that precipitated appellee's complaints and given that appellee's complaints have been specific to headaches. He also disagreed with Dr. Sander's opinion that appellee should be able to carry on with a normal life. Despite the fact that a fracture has healed, an individual may still continue to have significant pain. Dr. Bauer pointed out that fractures have ended the careers of large numbers professional athletes.
 {¶ 76} William Porter was also called on rebuttal. He testified that he believes he took his daughter to appellant's swimming party because his daughter was not able to drive and he would not have allowed it. He also indicated that the silver van that appellant described is his vehicle and that appellee would not have driven it as she has her own. He also disagreed with Camille Harris' testimony that appellee did not ride her horses much. Porter testified that appellee, before the accident, rode her horses "all the time." He also disagreed that he had to argue with appellee to do her chores.
 {¶ 77} Appellee also testified on rebuttal. She disagreed with Camille Harris' testimony that she removed her collar in Florida. She also testified that she rode her horses three or four times a week in the summer and every weekend in the winter. She indicated that she did share with Harris that she hoped one day to go to veterinary school, and she again denied driving to appellant's swimming party.
 {¶ 78} Following closing arguments, the case was sent to the jury. During jury deliberations the jury sent out a question regarding damages. The jury asked: "Please explain pages 13, 14, and 15 as to what we are awarding and to whom we are awarding. Who receives the medical expenses award. * * *." The trial court called the jury into the courtroom and instructed them as follows: "You are to award past medical expenses to William Porter and future medical expenses, if any, to Jessica Porter. Does that answer your question?" The jury responded affirmatively. The jury awarded damages to appellee in the amount of $10,000, past medical expenses to William Porter in the amount of $14,292.95, but no future medical expenses to appellee. After the trial court granted appellee's new trial motion, this appeal and cross-appeal followed.
 {¶ 79} Appellant contends that the trial court erred in granting a new trial based on Civ.R. 59(A)(4) and (6). Appellees contend that the trial court was correct in granting a new trial under Civ.R. 59(A)(4) and (6) but that it should have also granted a new trial based on Civ.R. 59(A)(1), (3), and (8). Civ.R. 59(A) provides, in pertinent part:
 {¶ 80} "(A) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
 {¶ 81} "(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
 {¶ 82} "* * *
 {¶ 83} "(3) Accident or surprise which ordinary prudence could not have guarded against;
 {¶ 84} "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;
 {¶ 85} "* * *.
 {¶ 86} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
 {¶ 87} "* * *
 {¶ 88} "(8) Newly discovered evidence, material for the party applying, which with reasonable diligence he could not have discovered and produced at trial[.]
 {¶ 89} "* * *."
 {¶ 90} The decision to grant or deny a new trial is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Sharp v. Norfolk Western Rwy. Co. (1995),72 Ohio St.3d 307, 312. The Supreme Court of Ohio has stated that "[t]he term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157. We shall first address appellant's assignment of error.
 {¶ 91} A trial court is permitted to grant a new trial under Civ.R. 59(A)(4) when the damages awarded are excessive or inadequate and appear to have been awarded due to passion or prejudice. To show passion or prejudice, the moving party must demonstrate that "the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities." Pena v. Northeast Ohio EmergencyAffiliates (1995), 108 Ohio App.3d 96, 104, appeal dismissed (1996),75 Ohio St.3d 1494. An appellate court reviewing a trial court's decision under Civ.R. 59(A)(4) should consider "the excessive [or inadequate] nature of the verdict, consideration by the jury of incompetent evidence, improper argument by counsel, or other improper conduct which can be said to have influenced the jury." Fields v. Dailey (1990),68 Ohio App.3d 33, 39, motion to certify record denied (1990),56 Ohio St.3d 703, citing Fromson Davis Co. v. Reider (1934),127 Ohio St. 564, paragraph three of the syllabus. However, the size of the verdict, by itself, is insufficient to show passion or prejudice.Pena, 108 Ohio App.3d at 104. Of course, the assessment of damages is a matter peculiarly within the province of the jury, and a trial court should not disturb the jury's award absent an affirmative finding of passion or prejudice, or unless the award "is so manifestly against the weight of the evidence as to show a misconception by the jury of its duties." Roe v. Heim (Dec. 8, 1999), Summit App. No. 19432, citingWilburn v. Cleveland Elec. Illum. Co. (1991), 74 Ohio App.3d 401, 413.
 {¶ 92} In this case, the trial court found that a new trial was warranted under Civ.R. 59(A)(4) because the amount awarded for pain and suffering ($10,000) was inadequate to compensate even the uncontested claims of injuries, listed by the trial court as the pain and suffering following the accident, missed school, three months in a neck brace, limited activity, and so forth. The trial court reasoned as follows:
 {¶ 93} "There was competent and unrefuted medical evidence of pain and suffering, missed school, the neck brace and limited activity, etc. There was also evidence presented by the Defense that Porter engaged in some normal activities, but the thrust of the evidence was the Plaintiff was a malingerer who exaggerated her injuries. It would appear that the jury found the evidence of malingering to be more probative, but in doing so failed to consider the medical evidence about the period which even the Defense admitted was injured and disabled. It might also be that the jury sought to punish Plaintiff for exaggerating her injuries.
 {¶ 94} "In any event, the jury award is inadequate for the uncontested portion of her injuries."
 {¶ 95} The trial court then cited two cases (one from this court) that, according to the trial court, stand for the proposition that:
 {¶ 96} "damages generally cannot be mathematically computed and that there is no specific yardstick for determining the amount of damages to be awarded for pain and suffering. But where pain and consequent suffering has been indicated by the medical reports, by the testimony of the plaintiff, and by the testimony of expert medical witnesses, appellate courts have found jury awards inadequate. To be sure, both these cases deal with no award for pain and suffering and as such are not directly on point, still they establish the rule that an award that shocks the sensibilities is grounds for a new trial particularly when, as here, the medical evidence of a substantial injury is uncontested."
 {¶ 97} We disagree with the trial court's decision. First, the trial court appears to have made its decision based solely on the size of the verdict. The gist of the trial court's ruling is that the award simply was not big enough. Second, the trial court held that the award for pain and suffering "shock[ed] the sensibilities" because the medical evidence of a "substantial injury" was uncontested. This is not true. Certainly, it was undisputed that appellee suffered a non-displaced fracture that healed completely in six months, that she was required to wear a rigid collar for three months, that she was required to receive tutoring for three months, and that some amount of emotional distress was reasonable. Everything else was disputed, including the source of appellee's depression, the cause of appellee's headaches and arm and leg pain, whether appellee was a person with ambitions, whether appellee suffered as much pain in the first three months as she described, whether appellee was as actively involved with her animals and horseback riding as she described, whether she suffered any permanent injuries, whether she was able to hold down a job, and so forth. Courts are generally willing to hold that a verdict shocks the sensibilities when uncontroverted evidence of damages was presented and the jury awards nothing or only nominal damages. See, e.g., Pena, 108 Ohio App.3d at 108. See, also,Perry v. Whitaker (June 22, 2001), Wood App. No. WD-00-065; Grau v.Donnelly (Dec. 8, 1995), Lucas App. No. L-95-116. In this case, however, given that only a small portion of appellee's damages were uncontested, and given that the jury awarded her $10,000 for her injuries, one cannot say that the verdict shocks the sensibilities.[3]
 {¶ 98} Nevertheless, appellee contends that the trial court did not err in granting a new a new trial under Civ.R. 59(A)(4) because defense counsel engaged in improper questioning about whether appellee drove to appellant's swimming party. The trial court did not find in its decision that improper questioning influenced the jury. However, in reviewing the trial court's exercise of its discretion, we are permitted to consider whether improper argument or other improper conduct by counsel may have influenced the jury. See Fields, 68 Ohio App.3d at 39.
 {¶ 99} Appellees contend that defense counsel improperly questioned William Porter about whether appellee drove to the party by intimating that others saw her drive to the party. In fact, the only witness to testify that appellee drove to the party admitted that she did not actually see appellee drive, she just heard that appellee had driven. While this line of questioning may have been slightly misleading, we believe that the jury was capable of sorting out the testimony and giving it the weight it deserved. We cannot say that the questioning was so misleading to have improperly influenced the jury. The case did not rise and fall on the question of whether appellee drove to this party. Out of all of the testimony provided by thirteen witnesses over five days of trial, we cannot say that these few questions, by themselves, had such an impact on the jury as to have compromised the verdict in any way. For all of these reasons, we find that the trial court abused its discretion in granting a new trial based on Civ.R. 59(A)(4).
 {¶ 100} The trial court also ordered a new trial based upon Civ.R. 59(A)(6), which permits a trial court to order a new trial when the verdict is not sustained by the "weight of the evidence." Though the rule itself speaks to the "weight of the evidence," the Ohio Supreme Court has made clear that, in making a ruling based on Civ.R. 59(A)(6), the trial court must:
 {¶ 101} "weigh the evidence and pass on the credibility of the witnesses; not in the substantially unlimited sense that such weight and credibility is passed on originally by the jury, but in the more restricted sense of whether it appears to the trial court that a manifest injustice has been done, and that the verdict is against the manifestweight of the evidence." (Emphasis added.) Rohde v. Farmer (1970),23 Ohio St.2d 82, paragraph three of the syllabus.
 {¶ 102} Because a decision under Civ.R. 59(A)(6) necessarily involves a weighing of the evidence, an appellate court should "view the evidence favorably to the trial court's action rather than to the original jury's verdict." Id. at 94; Malone v. Courtyard Marriott Ltd.Partnership (1996), 74 Ohio St.3d 440, 448. This is so because the trial court has had the advantage of seeing and hearing the witnesses and passing on their credibility. Id. However, a trial court may not order a new trial based simply on a difference of opinion between it and the jury. Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183, quoting Poske v.Mergl (1959), 169 Ohio St. 70, 73-74. The trial court's job is not to judge the credibility of the evidence but to judge whether the evidence has a "semblance of credibility." Verbon, 7 Ohio App.3d at 183.
 {¶ 103} In addition, a trial court is permitted to order a new trial based on Civ.R. 59(A)(6) when a jury's award is inadequate due to the jury's failure to consider some element of damages established by uncontroverted evidence at trial. Pena, 108 Ohio App.3d at 104. A trial court may also order a new trial under this rule where the verdict is not supported by "competent, substantial, and credible evidence." Id.
 {¶ 104} Appellant argues, first, the trial court erred in granted a new trial under this rule because it applied the wrong standard. According to appellant, the trial court applied the "weight of the evidence" standard instead of the "manifest weight of the evidence" standard. We have previously held that such error is reversible. SeeTasch v. Chancey (Mar. 1, 2002), Ottawa App. No. OT-00-051. Here, however, we cannot say that the trial court applied the wrong standard. While the trial court at one point in the decision refer to "weight of the evidence," as the rule does, the court also quoted a decision where the court discussed the "manifest weight of the evidence," so we conclude that the trial court knew and applied the proper standard.
 {¶ 105} With regard to the merits of the trial court's decision, the trial court's reasoning on the manifest weight question was more or less the same as its reasoning on the adequacy question. In sum, the trial court believed that the evidence supported a larger verdict. The trial court found that the jury "misconstrued their duty" and "failed to consider the medical evidence about the period of time which even the Defense admitted [appellee] was injured and disabled." Appellant contends that the trial court erred because the verdict was supported by the evidence. Appellees, on the other hand, contend that the verdict was against the manifest weight of the evidence because the jury failed to consider an element of damages: future medical expenses. According to appellees, since the jury awarded medical expenses up to the date of the trial, it must have believed that all of appellee's injuries were caused by the accident. Therefore, it was inconsistent for the jury to fail to award future damages when there was medical testimony that appellee's treatment would be ongoing.
 {¶ 106} In deciding that the verdict was against the manifest weight of the evidence, the trial court did not so rule because the jury failed to consider an element of damages. It is therefore unnecessary for us to decide this issue. Nevertheless, the record establishes that the jury did not fail to consider future medical expenses; it considered them and then decided against awarding them. During deliberations, the jury sent out a question asking about the various types of damages and to whom they were to be awarded. The trial court instructed the jury that future medical expenses were to be awarded to appellee, and the jury declined to award them. Since it is in the jury's province to assess damages, Roe,
supra, a new trial was not warranted on these grounds. Moreover, the necessity of future medical expenses was not uncontroverted at trial. SeePena, 108 Ohio App.3d at 104 (a trial court may order a new trial under Civ.R. 59(A)(6) when the jury fails to consider an element of damages that is uncontroverted at trial).
 {¶ 107} We also find that, since the verdict was supported by "competent, substantial, and credible evidence," Pena,108 Ohio App.3d at 104, the trial court abused its discretion in ordering a new trial. Given the wealth of disputed evidence about proximate cause and damages as outlined above, it can only be concluded that the verdict was supported by the evidence, and the trial court should have denied the motion for new trial on this basis. We find appellant's assignment of error well-taken in its entirety.
 {¶ 108} In their cross-appeal, appellees argue in their first assignment of error that a new trial should have been granted under Civ.R. 59(A)(1) based on irregularity in the trial court proceedings, namely, that the trial court limited the time for opening arguments to 20 minutes and for closing arguments to 30 minutes. Counsel contends that he was prepared to deliver longer arguments and was required to make impromptu changes to his presentations. Similarly, it their second assignment of error appellees contend that the trial court should have granted a new trial based on Civ.R. 59(A)(3), accident or surprise, because counsel was required to shorten his arguments on short notice.
 {¶ 109} First, as to the time limit on opening argument, appellees do not point to a place in the record where time limits were imposed and where counsel objected to such limits. App.R. 16(A) provides as follows:
 {¶ 110} "(A) The appellant shall include in its brief, under the headings and in the order indicated, all of the following:
 {¶ 111} "* * *.
 {¶ 112} "(7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies
* * *." (Emphasis added.)
 {¶ 113} Because appellees have not complied with App.R. 16(A), we decline to review their argument about the time limitations for opening arguments. Appellees' first and second assignments of error are found not well-taken as to the time limitation for opening arguments.
 {¶ 114} As for the time limitations for closing argument, counsel did not object at trial to these limitations. Therefore, appellees have waived this argument for purposes appeal. If we were to review this alleged error at all, we would need to review it under the plain error doctrine. The Ohio Supreme Court has noted that, in civil cases, reviewing courts should apply the plain error doctrine in extremely limited circumstances. The court held:
 {¶ 115} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, syllabus.
 {¶ 116} We do not find the error complained of in this case to be one of the "extremely rare cases" where we run the risk of undermining public confidence in the judicial process by declining to review it. We therefore decline to apply the plain error doctrine. Appellees' first and second assignments of error are found not well-taken as they relate to the time limitation for closing arguments.
 {¶ 117} In their third assignment of error, appellees contend that the trial court should have granted a new trial based on Civ.R. 59(A)(8), which permits a court to order a new trial for newly discovered evidence. The Ohio Supreme Court has set forth the following test for granting a new trial based on newly discovered evidence:
 {¶ 118} "To warrant the granting of a motion for a new trial based on the ground of newly discovered evidence, it must be shown that (1) the new evidence must be such as will probably change the result if a new trial is granted, (2) it must have been discovered since the trial, (3) it must be such as could not in the exercise of due diligence have been discovered before the trial, (4) it must be material to the issues, (5) it must not be merely cumulative to former evidence, and (6) it must not merely impeach or contradict the former evidence." Sheen v. Kubiac
(1936), 131 Ohio St. 52, paragraph three of the syllabus. See, also,Benyak v. Tommer (Apr. 22, 1994), Ottawa App. No. 93OT029.
 {¶ 119} In this case, appellees' newly discovered evidence is an affidavit from Amanda Smith. In her affidavit, Smith avers that, "to the best of her recollection," William Porter drove her and appellee to the February 1998 pool party. Appellees contend that they could have not discovered this evidence before trial because they had no reason to anticipate that appellant would raise this issue at trial.
 {¶ 120} By the end of the trial, the state of the evidence as to whether appellee drove to the party was as follows: William Porter testified that he did not believe that appellee drove, appellee testified that she did not drive, and appellant testified that she never actually saw appellee drive but she heard that appellee did so. Given the state of the evidence on this issue, we cannot say that the additional affidavit would have changed the outcome of the trial. Moreover, the affidavit would have been offered only to contradict the former evidence. SeeSheen, 131 Ohio St. 52, at paragraph three of the syllabus. Therefore, we find that the trial court did not err in refusing to grant a new trial based on newly discovered evidence, and appellees' third assignment of error is found not well-taken.
 {¶ 121} Upon due consideration, we affirm in part and reverse in part the decision of the trial court. The trial court's decision is reversed to the extent that it granted a new trial based on Civ.R. 59(A)(4) and (6), and it is affirmed to the extent that it denied a new trial based on Civ.R. 59(A)(1), (3), and (8). Appellees/cross-appellants are ordered to pay the court costs of this appeal.
Judgment Affirmed in part and reversed in part.
Richard W. Knepper, J. and Mark L. Pietrykowski, J., concur.
Judith Ann Lanzinger, J., concurs in judgment only.
[1] Though both Jessica Porter and William Porter are appellees and cross-appellants, for ease of discussion we shall refer to Jessica individually as "appellee," to her father individually as "William Porter" or "Porter," and to the two collectively as "appellees."
[2] Again, for ease of discussion, we shall refer to Keefe as simply "appellant."
[3] Appellees cite Spicer v. Armco Steel Corp. (1974), 322 N.E.2d 279, in which the court held that the jury award of $15,000 was inadequate and ordered a new trial. We find this case distinguishable. First, in making its decision, the court in Spicer stated that it arrived at its decision with "considerable reluctance" because it fully realized that assessment of damages is within the province of the jury. Id. at 280. However, upon review of the uncontradicted evidence of life-threatening injuries, of multiple fractures including a rib fracture that punctured a lung, of an extensive hospital stay in which the plaintiff remained in traction for seven weeks, and so forth, the court held that the award was so inadequate as to shock the sensibilities. Id. at 280-281. Clearly, the injuries in Spicer were far more serious than they were here. Additionally, the damages in Spicer, unlike the present case, were uncontroverted.