DECISION AND JUDGMENT ENTRY
{¶ 1} Plaintiff-appellant, Steven Johnson, appeals the October 23, 2003 judgment of the Sandusky County Court of Common Pleas which, following a jury verdict in favor of defendant-appellee, John Bondra, D.O., denied appellant's motion for a new trial. For the following reasons we affirm the trial court's judgment.
 {¶ 2} On March 22, 2001, appellant filed a complaint against appellee alleging medical negligence involving two surgical procedures performed by appellee on March 30, 1998. On July 22, 2003, the matter proceeded to a jury trial and the following evidence was presented.
 {¶ 3} Appellant's case consisted of the testimony of his mother, Marilyn Ramon, appellant, and experts Neal J. Farber, M.D. and Marvin Winell, M.D. Ms. Ramon testified that in 1996, appellant, then age 16, began to complain about right foot pain. Ms. Ramon took appellant to a podiatrist, Dr. Pensiero, who diagnosed that appellant's growth plate had not completely fused and recommended shoe inserts. Ms. Ramon stated that the inserts did not help and that the pain progressed to appellant's right knee. Ms. Ramon then took appellant to a bone specialist, Dr. McDonnell, who believed that appellant was suffering from tendonitis. Again, shoe inserts were recommended. Dr. McDonnell also stated that appellant might wish to see Dr. Ebraheim, an orthopedic surgeon at the Medical College of Ohio ("MCO"). Ms. Ramon testified that she did not take her son to see Dr. Ebraheim because she was satisfied with Dr. McDonnell's diagnosis.
 {¶ 4} On March 5, 1998, appellant went to see Dr. Valone, his family physician, who referred him to appellee, Dr. Bondra. Ms. Ramon learned of the referral after appellant actually saw appellee and just moments before appellee telephoned her at work. According to Ms. Ramon, appellee told her that appellant had a "slipped epiphysis" (referred to in full as a slipped capital femoral epiphysis or "SCFE") and that appellant could put no weight on his hip because the bone could slip out. Appellee recommended a surgery where he would place pins in the hip to prevent further slippage of the bone. Ms. Ramon testified that appellee told her that he had never performed this type of surgery; he had only assisted a few times during medical school, and that he would have his partner, Dr. Stepanic, assist him in the operating room. Ms. Ramon testified that based on appellee's representation that Dr. Stepanic would be assisting; she agreed to let him perform the surgery.
 {¶ 5} That Sunday, the day prior to surgery, appellee met Ms. Ramon and appellant at Bellevue Hospital to sign the consent form and complete pre-admission testing. Although appellant was 18 at the time, Ms. Ramon signed the consent form. Dr. Stepanic was not mentioned during the meeting.
 {¶ 6} Monday, March 30, 1998, was appellant's surgery date. Following the procedure, appellee spoke with Ms. Ramon and indicated that, after viewing postoperative x-rays, he felt that one of the pins was placed too deeply. Ms. Ramon testified that she agreed to a second surgery, but requested that appellant remain under anesthetic until after the post-operative x-rays. Appellee agreed. After the second surgery, appellee indicated to Ms. Ramon that everything went well.
 {¶ 7} On April 2, 1998, appellant was discharged from the hospital and was instructed to use crutches and toe touch weight bearing only. Ms. Ramon testified that when she observed appellant he was using his crutches. On April 21, 1998, Ms. Ramon stated that she took appellant to the emergency room because he was complaining of knee and hip pain. Ms. Ramon indicated that appellant used his crutches to get to and from the house, car and emergency room.
 {¶ 8} Dr. Stepanic treated appellant in the emergency room. He looked at the incision, asked appellant some questions, and then reviewed the x-rays he had ordered. Ms. Ramon testified that Dr. Stepanic stated that the pins "were put in this way and they should have went in this way." Ms. Ramon also stated that Dr. Stepanic told them that the screw had pulled away from the bone and that appellant would need another surgery.
 {¶ 9} According to Ms. Ramon, while she and appellant were in the emergency room they overheard Dr. Stepanic speaking to appellee on the telephone; Dr. Stepanic stated, "chalk it up for a good learning experience." Ms. Ramon also testified that during the emergency room visit she learned that Dr. Stepanic had not been in the operating room with appellee. Ms. Ramon stated that this made her very upset. Appellant was released from the emergency room that evening.
 {¶ 10} The next day, appellee telephoned Ms. Ramon; he apologized and sent them, that day, to see Dr. Ebraheim at MCO in Toledo. Dr. Ebraheim informed them that the bone had slipped partially out of the socket and that surgery was needed. Dr. Mark Clark, along with Dr. Ebraheim, successfully performed the surgery.
 {¶ 11} Following appellant's third surgery and physical therapy, Ms. Ramon testified that appellant still has some trouble getting up and down from the floor where he plays with his nieces and nephews. He also has trouble riding a motorcycle or a lawn mower because his foot turns out.
 {¶ 12} During cross-examination, Ms. Ramon was asked why she did not take appellant to see Dr. Ebraheim when both Drs. Pensiero and McDonnell suggested it. Ms. Ramon responded that she believed that the doctors meant appellant should see Dr. Ebraheim only if they desired another opinion. Ms. Ramon acknowledged that the consent form she signed did not indicate that anyone other than appellee would be performing the surgery.
 {¶ 13} Appellant, Steven Johnson, testified as follows. Appellant stated that he is six feet four inches tall and weighs approximately 300 pounds. Appellant similarly testified about the pain he experienced beginning at his right foot and progressing up to his hip. Appellant also testified about the initial doctor's visits and misdiagnoses.
 {¶ 14} Appellant testified that when he first visited appellee he was immediately sent to the hospital for x-rays. Appellee diagnosed him with SCFE, told appellant he needed surgery, and instructed him not to bear weight on his hip. Based on his mother's telephone conversation with appellee, appellant believed that Dr. Stepanic would be assisting with the surgery.
 {¶ 15} Appellant testified that on the Sunday before surgery, at Bellevue Hospital, he gave his mother permission to sign the form consenting to surgery. According to appellant, appellee told them that Dr. Stepanic would be assisting him.
 {¶ 16} Following the first and second surgeries, appellant stated that he followed appellee's instructions regarding weight bearing. Appellant denied making statements that he was full weight bearing several days prior to his April 21, 1998 emergency room visit.
 {¶ 17} Appellant testified that his MCO surgery was successful. As to appellant's current condition, he testified that running, kneeling, squatting, and climbing stairs are more difficult. Appellant stated that due to his right leg turn out, he cannot straddle a riding lawn mower.
 {¶ 18} During cross-examination, appellant was questioned as to why, during his discovery deposition, appellant failed to mention any conversation he overheard between appellee and his mother regarding Dr. Stepanic. Appellant testified that he had no recollection of the pre-admission history or physical performed the day prior to surgery.
 {¶ 19} Following the first two surgeries, appellant testified that he had no recollection as to whether he saw Dr. Valone on April 15, and whether he drove to the appointment. Appellant also disputed driving himself to an appointment with appellee two days later.
 {¶ 20} Appellant testified that four to five months following his third surgery he felt no hip pain. Appellant did not dispute that in October 1999, he stated that he was having no difficulty with his hips.
 {¶ 21} Appellant's expert, Neal Farber, M.D., testified via videotaped deposition as follows. Dr. Farber stated that he specializes in medical ethics. Dr. Farber testified that assuming that appellee told Ms. Ramon that Dr. Stepanic would be assisting, and he in fact was not, the informed consent was invalid because "a component of information was not adequately conveyed to the patient or the patient's mother."
 {¶ 22} A second expert, also by videotaped deposition, testified on appellant's behalf. Marvin Winell, M.D., testified that he is an orthopedic surgeon and practices in New Jersey. Dr. Winell testified that he has reviewed approximately one to two cases per month for the past ten years, representing less than one per cent of his overall practice. Dr. Winell testified that he reviewed appellant's medical records and the depositions of appellee and Dr. Gurd, appellee's expert.
 {¶ 23} Dr. Winell testified that in his 34 years in practice, he has performed 25 to 30 SCFE surgeries. Dr. Winell stated that SCFE typically presents in overweight adolescent males. Dr. Winell stated that due to an endocrine problem, though appellant's chronological age was 18, physiologically, appellant was 15½ years old and overweight.
 {¶ 24} According to Dr. Winell, based on the medical records and x-rays he reviewed, when appellant first presented to appellee, he was suffering from a grade one slip, or a slippage of less than 30 degrees. Dr. Winell explained that there are three grades of slippage. Grade one is up to 30 degrees, grade two is 30 to 60 degrees, and grade three is more than 60 degrees.
 {¶ 25} After reviewing some of appellant's x-rays, Dr. Winell concluded that appellee failed to properly place the screws in appellant's femoral capital epiphysis. Dr. Winell explained that the top of the femoral head was obscured by the lead used to protect appellant's genitalia. Dr. Winell surmised that appellee thought the head was at the fracture line and failed to place the screws deeply enough. He determined that one screw completely missed the femoral head and that the second screw barely touched it. Dr. Winell testified that following appellant's first two surgeries, appellant's slippage progressed to a grade two.
 {¶ 26} Dr. Winell testified that to a reasonable degree of medical probability, appellee's placement of the screws deviated from the accepted standard of care for a board certified orthopedic surgeon. He again stated that appellant failed to place the screws deeply enough or in the proper direction.
 {¶ 27} Regarding future pain and suffering, Dr. Winell stated that as a result of the further slippage, appellant will have a "short leg gait" and will develop back problems. Dr. Winell also opined that appellant will eventually need hip replacement surgery.
 {¶ 28} During cross-examination, Dr. Winell acknowledged that the earlier SCFE is diagnosed and treated, permanent deformity may be avoided. Dr. Winell also acknowledged that the weight of the patient would affect the likelihood of whether a hip replacement was needed and how long a hip replacement would last.
 {¶ 29} Appellee testified on his behalf and presented the testimony of George Stepanic, D.O. and the expert testimony of Alan Gurd, D.O. Appellee testified that when he first met with appellant, he recommended pinning his hip. Appellee stated that he explained the procedure to appellant and his mother and disclosed his limited experience. Appellee indicated that he would be willing to perform the surgery or send appellant to MCO if they were not satisfied with his abilities.
 {¶ 30} According to appellee, he told Ms. Ramon that he "might, quote, unquote, ask Dr. Stepanic to help" because it was a "difficult case." Appellee denied telling Ms. Ramon that Dr. Stepanic had more experience at performing this type of procedure. Appellee testified that on the Sunday before surgery, at Bellevue Hospital, he explained that Dr. Stepanic was not available. Following an explanation of the procedure, Ms. Ramon signed the informed consent form.
 {¶ 31} Following the first surgery, appellee believed that one of the screws had actually gone through the femoral head into the femoral acetabulum joint. Appellee testified that he needed to back the screw out; he obtained Ms. Ramon's informed consent for the second surgery. Appellee removed the screw and inserted a new screw with a washer to ensure that it would not migrate into the femoral head. During this procedure, as in the first surgery, appellee was continuously taking "spot films" or nonpermanent x-rays to confirm the placement of the screw.
 {¶ 32} When appellee discharged appellant on April 2, 1998, he ordered 30 percent weight bearing, due to appellant's weight, and scheduled a follow-up appointment for April 17. Appellee testified that at that appointment appellant was doing very well; appellee asked him to maintain 30 percent weight bearing due to the risk that sheer force would affect appellant's hip. Appellee testified that he did not believe that appellant followed these orders.
 {¶ 33} On April 21, 1998, his partner, Dr. Stepanic, called appellee and informed him that he had appellant in the emergency room. Dr. Stepanic told appellee that one of the screws had cut out of the femoral head and that appellant had been walking on it. Appellee stated that he disagreed with the theory that by pinning the hip all risk of slippage was eliminated.
 {¶ 34} Appellee testified that he telephoned Dr. Ebraheim the next day and he agreed to accept appellant's case. Appellee then telephoned Ms. Ramon and told her that she must take appellant to MCO; she reluctantly agreed. According to appellee, Dr. Ebraheim told him that appellant's SCFE surgery was the most difficult he had ever performed.
 {¶ 35} Appellee stated that the shortening of appellant's leg could be attributed to the slip itself. Appellee agreed that the amount of time the SCFE was left untreated could have influenced the leg turn out or length discrepancy. Appellee felt that had the SCFE been discovered in 1997, the rotation would not have been as severe.
 {¶ 36} During appellee's cross-examination, he stated that he had considered asking Dr. Stepanic if he was available for appellant's surgery because Dr. Stepanic weighs 260 pounds compared to appellee's 170 pounds and that it would be easier for Dr. Stepanic to position appellant. Appellee stated that he went back to his office and noticed that Dr. Stepanic's schedule was completely full on the surgery date. Appellee admitted that he did not consult with a more experienced surgeon prior to the surgery because he did not feel it was necessary.
 {¶ 37} According to appellee, the screws placed at MCO came in at a different angle but appeared to end up in about the same place as the screws he placed. Appellee testified that the shadows of where his screws had been placed did not show up on the MCO x-rays because plain film x-ray would not reveal them; an MRI may have picked up the shadows.
 {¶ 38} George C. Stepanic, Jr., D.O., testified that appellee employed him following his residency. Dr. Stepanic stated that on April 21, 1998, he treated appellant in the emergency room. Dr. Stepanic testified that there were no crutches in the examining room and that appellant told him that he had been weight bearing for a few days. A female was with appellant and Dr. Stepanic believed it was his mother.
 {¶ 39} According to Dr. Stepanic, he reviewed appellant's x-rays and concluded that one of the screws had penetrated the femoral head. Dr. Stepanic called appellee and, in speaking of appellant's long road to his initial diagnosis, Dr. Stepanic remarked "chalk it up to experience."
 {¶ 40} When questioned about appellant's lack of crutches, Dr. Stepanic admitted that he had not seen appellant enter the examination room and admitted that it would be reasonable for him to be placed in a wheelchair upon arrival at the emergency room.
 {¶ 41} Appellee's expert, Alan Gurd, D.O., testified that he believed, based upon a reasonable degree of medical certainty, that appellee did not deviate from the generally accepted standards of care in his treatment of appellant. Dr. Gurd stated that he has performed 300 to 600 SCFE surgeries in his career.
 {¶ 42} Dr. Gurd stated that appellee's use of the C-arm fluoroscopy (for "spot x-ray") and plain x-ray to position appellant was within the standard of care. Appellee also stated that the use of two screws to pin the hip was acceptable.
 {¶ 43} After reviewing the x-rays taken after the second surgery, Dr. Gurd testified that he believed that appellee had at least one x-ray film showing satisfactory placement of the pins. Dr. Gurd also stated that appellant's right foot turn out is a classic physical sign of a SCFE and was not due to the surgeries.
 {¶ 44} Dr. Gurd was cross-examined as to why his opinion of the pin placement differed from his deposition testimony. Dr. Gurd explained that his opinion changed due to subsequent, additional x-rays provided by appellee.
 {¶ 45} Dr. Gurd also stated that the shadowing effect would allow someone to see on an x-ray evidence of where the screw had been. Dr. Gurd admitted that after reviewing the MCO x-ray and CT films he saw no evidence of a screw being moved. Dr. Gurd stated that he would have expected to see some evidence of the screws in appellant's femoral head. Dr. Gurd acknowledged that when appellant arrived at MCO, the surgeons interpreting appellant's pre-operative x-rays determined that neither pin crossed the physis.
 {¶ 46} At the conclusion of the testimony, the jury awarded a general verdict in favor of appellee. The jury found that although appellee was negligent (Interrogatory A), his negligence was not the proximate cause of appellant's injuries (Interrogatory B.)
 {¶ 47} On August 1, 2003, appellant filed a motion for a new trial pursuant to Civ.R. 59, arguing that the verdict was against the weight of the evidence. Appellant also argued that, under Civ.R. 49(B), because the interrogatory answer (Interrogatory A) was inconsistent with the general verdict the court should grant a new trial.
 {¶ 48} On October 23, 2003, the trial court denied appellant's motion. The court concluded that the jury's answers to the interrogatories were not inconsistent and that, even assuming they were, because appellant failed to bring the alleged inconsistency to the court's attention prior to discharging the jury he waived the argument. This appeal followed.
 {¶ 49} Appellant raises the following assignment of error:
 {¶ 50} The trial court erred and abused its discretion in not finding that the jury verdict was against the manifest weight of the evidence and denying the plaintiff's motion for a new trial."
 {¶ 51} In his sole assignment of error, appellant contends that the jury failed to consider appellant's need for a second surgery as an element of damages.[1] Appellant argues that because the jury found that appellee was negligent, the need for a second surgery due to such negligence is conclusive of, at minimum, nominal damages. Conversely, appellee contends that appellant failed to establish that any damage resulted from the second surgery only.
 {¶ 52} The decision whether to grant or deny a motion for a new trial is within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. Sharp v.Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 53} Pursuant to Civ.R. 59(A)(6), a court may order a new trial when the verdict is not sustained by the "weight of the evidence." In Rohde v. Farmer (1974), 23 Ohio St.2d 82, paragraph three of the syllabus, the Ohio Supreme Court articulated that when ruling on motion for a new trial based on Civ.R. 59(A)(6), a court must:
 {¶ 54} "weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that a manifest injustice has been done and that the verdict is against the manifest weight of the evidence."
 {¶ 55} Because a decision under Civ.R. 59(A)(6) involves a weighing of the evidence, an appellate court should "view the evidence favorably to the trial court's action rather than to the original jury's verdict." Id. at 94. "`The predicate for that rule springs, in part, from the principle that the discretion of the trial judge in granting a new trial may be supported by his having determined from the surrounding circumstances and atmosphere of the trial that the jury's verdict resulted in manifest injustice.'" Mannion v. Sandel (2001),91 Ohio St.3d 318, 322, quoting Jenkins v. Krieger (1981), 67 Ohio St.2d 314,320.
 {¶ 56} A trial court should order a new trial based on Civ.R. 59(A)(6) when a jury's award is inadequate due to the jury's failure to consider some element of damages established by uncontroverted evidence at trial. Pena v. Northeast OhioEmergency Affiliates, Inc. (1995), 108 Ohio App.3d 96, 104. A trial court should also order a new trial where the verdict is not supported by "competent, substantial, and credible evidence." Id.
 {¶ 57} In his sole assignment of error, appellant contends that a new trial should have been granted because the jury, at minimum, failed to consider the need for the second surgery as an element of damages. We disagree.
 {¶ 58} As set forth above, appellee, following post-operative x-rays, believed that one of the screws was placed too deeply and that he needed to perform a second surgery to back the screw out. The expert testimony presented at trial provided that if a surgeon believed that a screw had been malpositioned during surgery, it would not be considered a deviation from the accepted standard of care to perform a second surgery. Additionally, the second surgery was conducted within hours of the first and no quanitative amount of damages had been shown. Further, as appellant concedes, the evidence is disputed as to whether appellant's premature weight bearing led to the need for the third, MCO surgery. Finally, with regard to future damages, testimony was presented that appellant's right foot turn out was caused by the SCFE itself and not the surgeries. There was testimony presented which suggested that the two-year delay in diagnosis may have worsened appellant's condition. There was also the issue of appellant's weight, which, according to the testimony presented may have a direct bearing on whether a hip replacement would be necessary in the future.
 {¶ 59} Based on the foregoing, and because the evidence of damages was controverted, we cannot say that the trial court abused its discretion when it denied appellant's motion for a new trial. Accordingly, appellant's assignment of error is not well-taken.
 {¶ 60} On consideration whereof, we find that substantial justice was done the party complaining and the judgment of the Sandusky County Court of Common Pleas is affirmed. Pursuant to App.R. 24, costs of this appeal are assessed to appellant.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Pietrykowski, J., Lanzinger, J., Concur.
[1] For purposes of appeal, appellant abandoned his Civ.R. 49 argument.